**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT, *et al*.; | ) ) | |
| | ) | Case No. 1:19-cv-00703 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| DAVID BERNHARDT, *et al*.; | ) ) | |
| Federal Defendants. | ) ) | |

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

I.      Legal Background .......................................................................................................3

        A.      BLM's Oil and Gas Planning and Management Framework ...........................5

        B.      Planning and Management in the Greater Chaco Landscape ..........................7

II.     Facts Giving Rise to This Litigation ........................................................................8

ARGUMENT ..................................................................................................................10

I.      Citizen Groups Are Likely to Prevail on the Merits .............................................10

II.     Citizen Groups Will Suffer Immediate and Irreparable Injury .............................13

        A.      People and the Environment Will Be Irreparably Harmed by Continued and Future Horizontal Drilling and Hydraulic Fracturing of the Mancos Shale.....15

        B.      The Health of Diné and Other Community Members Is Threatened by Ongoing and Future Development of the Mancos Shale. ...............................................17

        C.      BLM's Authorization of Mancos Shale Drilling Permits Absent NEPA Compliance Threatens Irreparable Harm. .....................................................19

III.   The Balance of Equities Tips Strongly in the Plaintiffs' Favor........................21

IV.   Granting Preliminary Relief is in the Public Interest .......................................24

V.    Requiring Citizen Groups to Pay a Substantial Bond Would Chill or Preclude Access to the Courts and Frustrate NEPA's Purposes ...................................................25

CONCLUSION ..............................................................................................................26

# TABLE OF AUTHORITIES

Cases

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006)................................................6

*Acierno v. New Castle Cnty.,* 40 F.3d 645 (3d Cir. 1994) ....................................................21, 22

*Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531 (1987)...................................................14, 21

*Anglers of the AU Sable v. U.S. Forest Serv.,* 402 F. Supp. 2d 826 (E.D. Mich. 2005)...............15

*Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429 (10th Cir. 1996) ........................................................................................................................................14

*Colorado Wild v. U.S. Forest Service*, 299 F.Supp.2d 1184 (2004)...........................................24

*Colorado Wild, Inc. v. U.S. Forest Service*, 523 F. Supp. 2d 1213 (D. Colo. 2007)........ 20, 24, 25

*Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780 (10th Cir. 1964)...........................25

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002)..................................................... 14, 16, 19, 25

*Diné C.A.R.E. v. Bernhardt*, 923 F. 3d 831 (10th Cir. 2019).........................1, 2, 9, 10, 11, 13, 20

*Diné C.A.R.E. v. Jewell*, 2015 WL 4997207 (D.N.M. Aug. 14, 2015), *aff'd,* 839 F.3d 1276 (10th Cir. 2016)..................................................................................................................... 14, 16, 17

*Diné C.A.R.E. v. Jewell*, 312 F. Supp. 3d 1031 (D.N.M. 2018)....................................................9

*Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) .......................................13

*Fairway Shoppes Joint Venture v. Dryclean U.S.A. of Florida, Inc.,* 1996 WL 924705 (S.D. Fla. 1996) ........................................................................................................................................18

*Grand Canyon Trust v. Federal Aviation Administration,* 290 F.3d 339 (D.C. Cir. 2002)..........22

*Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250 (10th Cir. 2003)....................................13

*Koerpel v. Heckler*, 797 F.2d 858 (10th Cir. 1986) ....................................................................11

*Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007) ....................................................22

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371, (1989)...................................................22

*Monsanto v. Geertson Seed Farms*, 561 U.S. 139 (2010)...........................................................18

*Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987)...............................................16

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) ..... 3, 19

*Northern Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466 (9th Cir. 1986) ..........................................22

*Northern Plains Res. Council v. Surface Trsp. Bd.*, 668 F.3d 1067 (9th Cir. 2011)....................13

*Pennaco Energy v. U.S. Dep't of Interior*, 377 F.3d 1147  (10th Cir. 2004)................................6

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989)................................. 4, 19, 20

*RoDa Drilling Co. v. Siegal,* 552 F.3d 1203 (10th Cir. 2009) .....................................................10

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718 (9th Cir.

   2009) ...............................................................................................................................7

*San Luis & Delta-Mendota Water Auth. v. Locke*, 2010 WL 500455 (E.D. Cal. 2010)..............24

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233 (D. Colo.

   2009) .................................................................................................... 15, 20, 21, 23

*Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113 (9th Cir.2005)..............................................23

*Save Strawberry Canyon v. Dep't of Energy,* 613 F.Supp.2d 1177 (N.D. Cal. 2009).................20

*Seattle Audubon Society v. Evans,* 771 F. Supp. 1081 (W.D. Wash. 1991)................................24

*Sierra Club v. Hodel,* 848 F.2d 1068 (10th Cir. 1988) ...............................................................19

*Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir. 1989)............................................................19, 20

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349 (D.D.C. 2012) ..17,

   24

*Utah Env't Cong. v. Bosworth*, 443 F.3d 732 (10th Cir. 2006)....................................................4

*Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078 (10th Cir. 2004).....................................21

*Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760 (10th Cir. 2014) ..............................13

*Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992) ........................24

*WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677 (10th Cir. 2015) ....................4

*Wilderness Workshop v. BLM*, 531 F.3d 1220 (10th Cir. 2008) ................................................13

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ....................................................................... 1, 10, 13

*Wyo. Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973) ..........................24

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F.Supp.2d 1232 (D.Wyo. 2005).......25

## Statutes

30 U.S.C. § 226 ............................................................................................................. 22, 23, 25

43 U.S.C. § 1701 ......................................................................................................................5

43 U.S.C. §§ 1701 *et seq*. ........................................................................................................5

## Regulations

40 C.F.R. § 1500.1 .................................................................................................................3, 4

40 C.F.R. § 1501.2 ...................................................................................................................19

40 C.F.R. § 1501.4 .....................................................................................................................4

40 C.F.R. § 1502.16 ...................................................................................................................4

40 C.F.R. § 1502.22 .................................................................................................................19

40 C.F.R. § 1502.3 .....................................................................................................................4

40 C.F.R. § 1508.13 ...................................................................................................................4

40 C.F.R. § 1508.27 ...................................................................................................................5

40 C.F.R. § 1508.7 .................................................................................................... 2, 4, 11, 13

43 C.F.R. § 3101 ........................................................................................................................6

43 C.F.R. § 3160 .................................................................................................5

43 C.F.R. § 3161.2 ...........................................................................................22

43 C.F.R. § 3162.1 .....................................................................................22, 23

43 C.F.R. § 46.140 .............................................................................................6

43 C.F.R. § 46.325 .............................................................................................4

43 C.F.R. §§ 1600 *et seq.* ................................................................................6

43 C.F.R. §§ 3120 *et seq.* ................................................................................6

<u>Rules</u>

Fed. R. Civ. P. 65(b) .........................................................................................3

Fed. R. Civ. P. 65(c) .......................................................................................25

<u>Other Authorities</u>

79 Fed. Reg. 10,548 ....................................................................................7, 20

**LIST OF EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Thomas W. Engler, et al., "Oil and Gas Resource Development for San Juan Basin, New Mexico" (2001) ("2001 RFDS") |
| Exhibit 2 | Thomas W. Engler, et al., "Reasonable Foreseeable Development (RFD) for Northern New Mexico" (2014) ("2014 RFDS") |
| Exhibit 3 | Kelsey Crocker & James F. Glover, Bureau of Land Management, "Reasonable Foreseeable Development for Oil and Gas Activities: Mancos-Gallup RMPA Planning Area, Farmington Field Office, northwestern New Mexico" (2018) ("2018 RFDS") |
| Exhibit 4 | 2003 Farmington Field Office Resource Management Plan/Draft EIS, Chapter 4 ("2003 RMP/EIS") |
| Exhibit 5 | DOI-BLM-NM-F010-2015-0161-EA |
| Exhibit 6 | DOI-BLM-NM-F010-2015-0163-EA |
| Exhibit 7 | DOI-BLM-NM-F010-2015-0220-EA |
| Exhibit 8 | DOI-BLM-NM-F010-2016-0007-EA |
| Exhibit 9 | DOI-BLM-NM-F010-2016-0054-EA |
| Exhibit 10 | DOI-BLM-NM-F010-2016-0229-EA |
| Exhibit 11 | DOI-BLM-NM-F010-2016-0251-EA |
| Exhibit 12 | DOI-BLM-NM-F010-2016-0252-EA |
| Exhibit 13 | DOI-BLM-NM-F010-2016-0260-EA |
| Exhibit 14 | DOI-BLM-NM-F010-2017-0015-EA |
| Exhibit 15 | DOI-BLM-NM-F010-2017-0017-EA |
| Exhibit 16 | DOI-BLM-NM-F010-2017-0018-EA |
| Exhibit 17 | DOI-BLM-NM-F010-2017-0028-EA |
| Exhibit 18 | DOI-BLM-NM-F010-2017-0029-EA |
| Exhibit 19 | DOI-BLM-NM-F010-2017-0038-EA |
| Exhibit 20 | DOI-BLM-NM-F010-2017-0039-EA |
| Exhibit 21 | DOI-BLM-NM-F010-2017-0042-EA |
| Exhibit 22 | DOI-BLM-NM-F010-2017-0057-EA |
| Exhibit 23 | DOI-BLM-NM-F010-2017-0058-EA |
| Exhibit 24 | DOI-BLM-NM-F010-2017-0085-EA |
| Exhibit 25 | DOI-BLM-NM-F010-2017-0095-EA |
| Exhibit 26 | DOI-BLM-NM-F010-2017-0103-EA |
| Exhibit 27 | DOI-BLM-NM-F010-2017-0115-EA |
| Exhibit 28 | DOI-BLM-NM-F010-2017-0126-EA |
| Exhibit 29 | DOI-BLM-NM-F010-2018-0016-EA |
| Exhibit 30 | DOI-BLM-NM-F010-2018-0017-EA |
| Exhibit 31 | DOI-BLM-NM-F010-2018-0035-EA |
| Exhibit 32 | DOI-BLM-NM-F010-2018-0042-EA |
| Exhibit 33 | DOI-BLM-NM-F010-2018-0047-EA |
| Exhibit 34 | DOI-BLM-NM-F010-2018-0063-EA |
| Exhibit 35 | DOI-BLM-NM-F010-2018-0103-EA |
| Exhibit 36 | DOI-BLM-NM-F010-2019-0047-EA |
| Exhibit 37 | Declaration of Kendra Pinto (July 2019) |

| Exhibit 38 | Declaration of Carol Davis (August 2019) |
| Exhibit 39 | Declaration of Mike Eisenfeld (August 2019) |
| Exhibit 40 | Declaration of Sonia Grant (July 2019) |
| Exhibit 41 | Declaration of Mark Pearson (August 2019) |
| Exhibit 42 | Declaration of Miya King-Flaherty (July 2019) |
| Exhibit 43 | Declaration of Aaron Isherwood (July 2019) |
| Exhibit 44 | Declaration of Teresa Seamster (August 2019) |
| Exhibit 45 | Declaration of Jeremy Nichols (July 2019) |
| Exhibit 46 | Declaration of John Horning (July 2019) |
| Exhibit 47 | Declaration of Julia Guarino (August 2019) |

# INTRODUCTION

Diné Citizens Against Ruining Our Environment, San Juan Citizens Alliance, Sierra Club, and WildEarth Guardians (collectively "Citizen Groups") move for a temporary restraining order ("TRO") and preliminary injunciton, pursuant to Rule 65(b) to enjoin Federal Defendants from allowing any ongoing or future ground disturbance, construction, oil and gas drilling, and oil and gas production on the applications for permits to drill ("APDs") challenged herein. Unless the Court maintains the status quo on the ground for the challenged decisions issued by the Bureau of Land Management ("BLM"), BLM has indicated it will continue to allow construction of roads, pipelines, and well pads, along with drilling and fracking shale oil wells, in violation of the law. The resulting harm to people and the environment will be irreparable; the balance of harms tips heavily in the Citizen Groups' favor; there is a strong public interest in protecting the environment and ensuring compliance with the National Environmental Policy Act ("NEPA"); and Citizen Groups are likely to prevail on the merits of their claims.

A plaintiff seeking preliminary relief through a TRO "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Citizen Groups have met all four factors here.

First, Citizen Groups are likely to succeed on the merits. In March 2015, Citizen Groups filed a nearly identical lawsuit challenging hundreds of BLM's APD approvals, which resulted in a decision at the Tenth Circuit vacating BLM's approval of similar Mancos Shale APDs issued from 2014 to 2016 for failing to comply with NEPA. *See Diné C.A.R.E. v. Bernhardt*, 923 F. 3d 831 (10th Cir. 2019). As here, that case challenged BLM's authorization of hundreds of

individual Mancos Shale wells for failing to take a hard look at cumulative impacts under NEPA. 40 C.F.R. § 1508.7. Since the last amended complaint for that case in September 2016, BLM has continued approving Mancos Shale wells without considering the cumulative impacts of past, present, and reasonably foreseeable future Mancos Shale development across the Greater Chaco Landscape. *Id.* The present case challenges BLM's approval of 255 additional Mancos Shale drilling permits and the 32 EAs associated with these approvals, all of which suffer from the same deficient cumulative impacts analysis as the permits vacated by the Tenth Circuit.[1]

In *Diné C.A.R.E.*, the Tenth Circuit held that "BLM was required to, but did not, consider the cumulative impacts on water resources associated with drilling the 3,960 reasonably foreseeable horizontal Mancos Shale wells." 923 F.3d at 857. The Tenth Circuit reasoned that BLM's 2014 Reasonably Foreseeable Development Scenario ("2014 RFDS") "made it reasonably foreseeable that 3,960 horizontal Mancos Shale wells would be drilled, and NEPA therefore required the BLM to consider the cumulative impacts of those wells in the agency's individual EAs for subsequent horizontal Mancos Shale well APDs." *Id.* at 852-53. The permits challenged here suffer from the same fatal defect. Of the 255 drilling authorizations and their associated EAs challenged in this case, each fails to analyze the cumulative impacts of the authorized wells when added to the 3,960 foreseeable wells across the Greater Chaco Landscape.[2]

---

[1] *See* Declaration of Julia Guarino (Guarino Dec.) at ¶ 48 (Ex 47).

[2] A new RFDS was prepared in 2018 that provided a baseline scenario projection of 3,200 new wells. 2018 RFDS at 2 (Ex. 3). That updated projection applies to five of the 32 challenged EAs that tier to the 2018 RFDS: DOI-BLM-NM-F010-2018-0042-EA (Ex. 32), DOI-BLM-NM-F010-2018-0047-EA (Ex. 33), DOI-BLM-NM-F010-2018-0063-EA (Ex. 34), DOI-BLM-NM-F010-2018-0103-EA (Ex. 35), and DOI-BLM-NM-F010-2019-0047-EA. (Ex. 36). Those EAs still fail to analyze cumulative impacts from 3,200 new Mancos Shale wells.

Second, once drilled, each additional Mancos Shale well will add to a legacy of irreparable harms to people and the environment. Third, permanent harm to the environment, human health, and Citizen Groups' legal rights outweigh the temporary, conditional, and speculative economic harm BLM may suffer. Finally, there is a strong and inherent public interest in protecting the environment and ensuring compliance with NEPA.

In the absence of preliminary relief, the status quo on the ground will not be maintained. BLM has a demonstrated history of continuing to approve Mancos Shale drilling permits in the face of a legal challenge, and industry has consistently developed those wells despite the known risk that the approvals could be deemed unlawful and vacated. Citizen Groups' attorneys reached out to agency counsel in advance of filing this case, and then met with BLM officials regarding this case. The agency confirmed that development on the challenged APDs is planned and ongoing. Despite initial efforts to reach a resolution, BLM ultimately determined that it would take no action regarding the challenged APDs, and intends to proceed with Mancos Shale APD approvals without abatement. A TRO is necessary to ensure permanent, irreparable harm does not occur during the pendency of this case. Accordingly, Citizen Groups respectfully request that the Court grant their motion for a TRO and preliminatry injunction, pursuant to Rule 65(b).

## BACKGROUND

### I.   Legal Background

NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a); *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 703 (10th Cir. 2009). The law requires federal agencies to fully consider the environmental implications of their actions, taking "high quality" information, "accurate scientific analysis," "expert agency comments," and "public scrutiny" into account prior to making decisions. 40 C.F.R. § 1500.1(b).  This

consideration is meant to "foster excellent action," resulting in decisions that are well-informed

and "protect, restore, and enhance the environment." *Id.* § 1500.1(c); *see also id.* § 1502.16(d)

("NEPA's purpose is not to generate paperwork – even excellent paperwork – but to foster

excellent action."). To fulfill NEPA's goals, federal agencies are required to analyze the impacts

of their actions on the human environment prior to undertaking their actions. *Robertson v.*

*Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (holding that NEPA imposes "action

forcing procedures . . . requir[ing] that agencies take a *hard look* at environmental

consequences") (internal quotations omitted, emphasis added); *see also Utah Env't Cong. v.*

*Bosworth*, 443 F.3d 732, 735-36 (10th Cir. 2006). To accomplish this purpose, NEPA requires

that all federal agencies prepare a "detailed statement" regarding all "major federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). To

determine whether a proposed action significantly affects the quality of the human environment

and requires an Environmental Impact Statement ("EIS"), the agency may first prepare an

Environmental Assessment ("EA"). 40 C.F.R. § 1501.4. Among the environmental impacts the

EA must evaluate are "the cumulative impacts of a project." *WildEarth Guardians v. U.S. Fish &*

*Wildlife Serv.*, 784 F.3d 677, 690 (10th Cir. 2015) (internal quotations omitted). Cumulative

effects include the impacts of all past, present, and reasonably foreseeable actions, regardless of

what entity or entities undertake the actions. 40 C.F.R. § 1508.7; *see also id.* § 1508.25(a)(2)

(Cumulative actions include those that, "when viewed with other proposed actions have

cumulatively significant impacts and should therefore be discussed in the same impact

statement." ). Where impacts are not significant, an agency may issue a Finding of No

Significant Impact ("FONSI"). 40 C.F.R. § 1508.13; *see also* 43 C.F.R. § 46.325(2). But, where

effects may be significant, an agency must prepare an EIS. 40 C.F.R. § 1502.3.

Federal agencies are required to determine whether direct, indirect, or cumulative impacts are significant by accounting for both the "context" and "intensity" of those impacts. 40 C.F.R. § 1508.27. Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality" and "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and is evaluated according to several additional elements, including, for example: unique characteristics of the geographic area such as ecologically critical areas; the degree to which the effects are likely to be highly controversial; the degree to which the possible effects are highly uncertain or involve unique or unknown risks; and whether the action has cumulatively significant impacts. *Id.* § 1508.27(b).

## A. BLM's Oil and Gas Planning and Management Framework

BLM manages onshore oil and gas leasing and development through a three-phase process. Each phase serves a distinct purpose, and is subject to unique rules, policies, and procedures. Ultimately, the three phases must ensure "orderly and efficient" development. 43 C.F.R. § 3160.0-4. Oil and gas development is a "multiple use" managed in accordance with the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq*. FLPMA, in 43 U.S.C. § 1701(a)(8), provides that BLM must manage the public lands:

> [I]n a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition, that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

In the first phase of oil and gas decisionmaking, BLM prepares a resource management plan ("RMP") in accordance with FLPMA, NEPA, and associated planning regulations, 43

C.F.R. §§ 1600 *et seq.*, with additional guidance from BLM's Land Use Planning Handbook (H-1601-1). With respect to fluid minerals leasing decisions, the RMP determines which lands containing federal minerals will be open to leasing and under what conditions, and analyzes the landscape-level cumulative impacts from predicted implementation-stage development. A reasonably foreseeable development scenario ("RFDS") underlies BLM's assumptions regarding the pace and scope of fluid minerals development within the RMP planning area.

In the second phase of oil and gas decisionmaking, BLM identifies the boundaries for lands to be offered for sale and proceeds to sell and execute leases for those lands through a lease sale. Leases are sold in accordance with 43 C.F.R. §§ 3120 *et seq*. Prior to a BLM lease sale, BLM has the authority to subject leases to terms and conditions, which can serve as "stipulations" to protect the environment. 43 C.F.R. § 3101.1-3. Once BLM issues a lease, it may impose conditions of approval that are delimited by the terms and conditions of the lease. 43 C.F.R. § 3101.1-2. Oil and gas leases confer "the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold." *Id*.

The APD stage is the third and final stage of BLM's oil and gas decisionmaking process where the agency authorizes the drilling of specific wells only after conducting site-specific NEPA analysis of that well's reasonably foreseeable environmental impacts. *Pennaco Energy v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151-52, 1160 (10th Cir. 2004); *see also* 43 C.F.R. § 3162.3-1. While BLM is permitted to "tier" site-specific analysis to a programmatic EIS, 40 C.F.R. § 1508.28, this is only permitted where "a broader [EIS] fully analyzed those significant effects." 43 C.F.R. § 46.140(c). BLM cannot use "principles of 'tiering' as its crutch." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1097 (9th Cir. 2006); *see also S. Fork Band*

*Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009)

("Though 'tiering' to a previous EIS is sometimes permissible, the previous document must

actually discuss the impacts of the project at issue."). BLM has never completed NEPA

analysis—at any stage of its oil and gas decisionmaking—that considers the impacts from 3,960

foreseeable Mancos Shale wells.

### B. Planning and Management in the Greater Chaco Landscape

In 2001, BLM released a 20-year Reasonably Foreseeable Development Scenario ("2001

RFDS") to project fluid mineral development for the New Mexico portion of the San Juan Basin

and to support agency decisionmaking for the Farmington Field Office's then-pending 2003

RMP. With respect to the Basin's Mancos Shale formation, the 2001 RFDS provided:

> [E]xisting Mancos Shale and Gallup Sandstone reservoirs are approaching
> depletion and are marginally economic. Most are not currently considered
> candidates for increased density development or further enhanced oil recovery
> operations. It is anticipated that many Mancos/Gallup wells will need to be
> plugged within the term of this RFD.[3]

While the 2001 RFDS acknowledged that horizontal drilling was a possibility for the

basin, BLM ultimately dismissed the use of this technology as economically and technically

infeasible. *Id.* at 8.3. In fact, the prospect of using horizontal fracking to develop the Mancos

Shale was so remote that the 2003 RMP and EIS did not even mention Mancos Shale or the type

of horizontal drilling and hydraulic fracturing technology necessary to develop it, let alone plan

for that development on the basis of a detailed analysis of that technology's environmental

impacts and through consideration of alternatives.[4]

On February 25, 2014, BLM posted a Notice of Intent to prepare an RMP Amendment

---

[3] 2001 RFDS at 5.24 (Ex. 1)

[4] *See* 2003 RMP/EIS (Ex. 4)

and EIS ("Mancos RMPA/EIS") for the Farmington Field Office in the Federal Register, 79 Fed.

Reg. 10,548, which provided in part:

> The RMP amendment is being developed in order to analyze the impacts of
> additional development in what was previously considered a fully developed oil
> and gas play within the San Juan Basin in northwestern New Mexico …
> Subsequent improvements and innovations in horizontal drilling technology and
> multi-stage hydraulic fracturing have enhanced the economics of developing [the
> Mancos Shale] horizon … As full-field development occurs, especially in the
> shale oil play, additional impacts may occur that previously were not anticipated
> in the RFD or analyzed in the current 2003 RMP/EIS, which will require an EIS-
> level plan amendment and revision of the RFD for complete analysis of the
> Mancos Shale/Gallup Formation.

In October 2014, BLM released an RFDS ("2014 RFDS") evaluating potential

development of the Mancos Shale for use in the pending Mancos RMPA/EIS. The 2014 RFDS

predicted that 3,960 Mancos Shale oil and gas wells would be added to the basin-wide total—

which includes the 9,942 wells predicted in the 2003 RMP—as a result of these technological

advancements.[5]

BLM reinitiated its NEPA scoping process for the Mancos RMPA "specific to the

extension of analysis in that EIS to [Bureau of Indian Affairs ("BIA")] decision-making

where BIA manages mineral leasing and associated activities in the RMPA Planning

Area." 81 Fed. Reg. 72,819 (Oct. 21, 2016). Then in 2018, BLM released a new RFDS

for oil and gas activities in preparation for the Mancos Shale RMPA/EIS, with a baseline

scenario projection of 3,200 new wells.[6]

## II.     Facts Giving Rise to This Litigation

BLM has been approving Mancos Shale drilling permits through individual EAs and

FONSIs since approximately 2010. These EAs provide piecemeal analyses of the environmental

---

[5] 2014 RFDS, Executive Summary (Ex. 2).

[6] 2018 RFDS (Ex. 3).

impacts of Mancos Shale development by limiting analysis to the disturbance anticipated from individual well development and associated infrastructure within each APD footprint, and fail to provide any planning or environmental review considering the full scale of past, ongoing, and reasonably foreseeable cumulative development of Mancos Shale.[7] Each EA also "tiers" to and incorporates by reference the information and analysis contained in BLM's 2003 RMP/EIS—a plan and environmental review that did not analyze the impacts of horizontal drilling and hydraulic fracturing—and fails to provide any meaningful analysis of horizontal drilling and hydraulic fracturing or associated impacts to people and the environment, and in particular impacts from water consumption and air pollutant emissions.[8]

Citizen Groups filed their original lawsuit in *Diné C.A.R.E.* in March 2015, challenging hundreds of individual Mancos Shale drilling permits approved by BLM since 2012. Citizen Groups filed amended complaints adding additional APD approvals since March 2015, with the final amended complaint in 2016. In April 2018, the district court held that the BLM did not violate NEPA in issuing the EAs and associated drilling permits. *Diné C.A.R.E. v. Jewell*, 312 F. Supp. 3d 1031 (D.N.M. 2018). Citizen Groups appealed that case to the Tenth Circuit, which reversed the district court and held that "BLM was required to, but did not, consider the cumulative impacts on water resources associated with drilling the 3,960 reasonably foreseeable horizontal Mancos Shale wells." *Diné C.A.R.E.*, 923 F. 3d at 857.

---

[7] *See, e.g.* DOI-BLM-NM-F010-2015-0161-EA at 21-23 (Ex. 5), which describes proposed surface disturbance for the proposed wells in detail, but includes no discussion of the cumulative impacts of development across any larger area. *See also* DOI-BLM-NM-F010-2019-0047-EA at 1-2 (Ex. 36), which states that the EA tiers to the 2003 RMP and will analyze resources and impacts on a "site-specific basis."

[8] *See* discussion in note 12, *infra*, describing each EA's discussion of air and water impacts.

BLM has been approving Mancos Shale APDs on an ongoing basis since Citizen Groups filed the original case. In the present case, Citizen Groups challenge 32 EAs authorizing 255 Mancos Shale wells not challenged in the previous case. These EAs are provided as exhibits to this motion. Each of the challenged EAs contain similar and sometimes identical analysis of impacts from Mancos Shale development.[9] Critically, BLM's approach and methodology concerning its cumulative analysis has remained consistent with those EAs vacated by the Tenth Circuit.[10] None of the EAs challenged here analyze the cumulative, incremental impact of each approved Mancos Shale well added to past, present, and reasonably foreseeable future actions, including the 3,960 reasonably foreseeable Mancos Shale wells.

## ARGUMENT

To obtain a preliminary injunction or TRO, the moving party must establish: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling v. Siegal,* 552 F.3d 1203, 1208-09 (10th Cir. 2009) (citing *Winter,* 555 U.S. at 20). Citizen Groups satisfy each element of the four-part test.

### I.   Citizen Groups Are Likely to Prevail on the Merits

BLM has never analyzed the cumulative impacts of Mancos Shale development across the Greater Chaco Landscape, in violation of NEPA. *Diné C.A.R.E.*, 923 F.3d 831, is factually and legally analogous to the present case. As the Tenth Circuit concluded: "the 2014 RFDS made it reasonably foreseeable that 3,960 horizontal Mancos Shale wells would be drilled, and NEPA

---

[9] *See* discussion in note 12, *infra.*

[10] *See* discussion in note 12, *infra.*

therefore required the BLM to consider the cumulative impacts of those wells in the EAs it conducted for subsequent horizontal Mancos Shale well APDs." *Id.* at 853. Accordingly, "BLM therefore acted arbitrarily and capriciously in issuing FONSIs and approving APDs associated with these EAs." *Id.* at 857. That same result is called for in this case, and therefore Citizen Groups are likely to succeed on the merits.

Here, the 32 EAs and 255 APDs challenged represent the next stage of litigation in which the Citizen Groups seek to hold BLM accountable for its unlawful approval of Mancos Shale wells. BLM has continued to approve Mancos Shale wells through individual, site-specific EAs that fail to consider the cumulative magnitude of impacts across the Greater Chaco Landscape— a practice that the Tenth Circuit has already determined violates NEPA. *Diné C.A.R.E.*, 923 F.3d at 857. The EAs supporting the challenged APDs plainly show that BLM has never considered the impacts from 3,960 reasonably foreseeable Mancos Shale wells, and in particular the cumulative environmental impacts from all foreseeable wells on water use and air pollution. "Once the 2014 RFDS issued, it became reasonably foreseeable to the BLM that the projected wells would be drilled, so the BLM needed to consider the cumulative impact of all those wells even if the wells were not going to be drilled imminently." *Id.* at 854 (citing 40 C.F.R. § 1508.7). While fully developed argument will be provided during merits briefing,[11] what is abundantly clear at this stage is that none of the EAs analyze the air pollutant emissions or water quantity impacts of all 3,960 wells that are reasonably foreseeable in the Mancos Shale.[12]

---

[11] The Tenth Circuit has held that at the preliminary injunction or TRO stage, the court should judge the merits of the case in a much less formal manner than at the merits stage. *Koerpel v. Heckler*, 797 F.2d 858, 867 (10th Cir. 1986) ("the correct test is whether the question presented is so serious, substantial, difficult, or doubtful as to be a fair ground for further litigation.").

[12] The majority of the EAs (25) do not quantify water use for drilling operations or purport to analyze the impacts to cumulative water quantity use in the Mancos Shale. *See* DOI-BLM-NM-F010-2015-0161-EA. (Ex. 5), DOI-BLM-NM-F010-2015-0163-EA (Ex. 6), DOI-BLM-NM-

---

F010-2015-0220-EA (Ex. 7), DOI-BLM-NM-F010-2016-0007-EA (Ex. 8), DOI-BLM-NM-F010-2016-0054-EA (Ex. 9), DOI-BLM-NM-F010-2016-0229-EA (Ex. 10), DOI-BLM-NM-F010-2016-0251-EA (Ex. 11), DOI-BLM-NM-F010-2016-0252-EA (Ex. 12), DOI-BLM-NM-F010-2016-0260-EA (Ex. 13), DOI-BLM-NM-F010-2017-0015-EA (Ex. 14), DOI-BLM-NM-F010-2017-0028-EA. (Ex. 17), DOI-BLM-NM-F010-2017-0029-EA (Ex. 18), DOI-BLM-NM-F010-2017-0038-EA (Ex. 19), DOI-BLM-NM-F010-2017-0042-EA (Ex. 21), DOI-BLM-NM-F010-2017-0085-EA (Ex. 24), DOI-BLM-NM-F010-2017-0095-EA (Ex. 25), DOI-BLM-NM-F010-2017-0103-EA (Ex. 26), DOI-BLM-NM-F010-2017-0115-EA (Ex. 27), DOI-BLM-NM-F010-2018-0017-EA (Ex. 30), DOI-BLM-NM-F010-2018-0035-EA (Ex. 31), DOI-BLM-NM-F010-2018-0042-EA (Ex. 32), DOI-BLM-NM-F010-2018-0047-EA. (Ex. 33), DOI-BLM-NM-F010-2018-0063-EA (Ex. 34), DOI-BLM-NM-F010-2018-0103-EA (Ex. 35), and DOI-BLM-NM-F010-2019-0047-EA (Ex. 36). Seven EAs analyze the cumulative water quantity that is likely to be used within the affected watershed for the particular wells being analyzed, but not in the Mancos-Gallup formation as a whole. *See* DOI-BLM-NM-F010-2017-0017-EA at 36-37 (Ex. 15), DOI-BLM-NM-F010-2017-0018-EA at 32-33 (Ex. 16), DOI-BLM-NM-F010-2017-0039-EA at 46-47 (Ex 20), DOI-BLM-NM-F010-2017-0057-EA at 46 (Ex. 22), DOI-BLM-NM-F010-2017-0058-EA at 48 (Ex. 23), DOI-BLM-NM-F010-2017-0126-EA at 35 (Ex. 28), and DOI-BLM-NM-F010-2018-0016-EA at 18-19 (Ex. 29).

Three EAs do not analyze cumulative air quality impacts at all, although they quantify direct air impacts for the proposed wells. *See* DOI-BLM-NM-F010-2017-0095-EA(Ex. 25), DOI-BLM-NM-F010-2017-0103-EA (Ex. 26), DOI-BLM-NM-F010-2017-0115-EA (Ex. 27). Nine EAs tier their cumulative impacts analysis to the 2003 RMP/EIS and 2014 RFDS, with identical language that reads "Analysis of cumulative impacts for reasonable development scenarios and RFDS of oil and gas wells on public lands in the FFO was presented in the 2003 RMP. This included modeling of impacts on air quality. A more detailed discussion of Cumulative Effects can be found in the Air Resources Technical Report (U.S. Department of Interior Bureau of Land Management, 2014)." *See* DOI-BLM-NM-F010-2015-0161-EA at 30 (Ex. 5), DOI-BLM-NM-F010-2015-0163-EA at 26 (Ex. 6), DOI-BLM-NM-F010-2015-0220-EA at 22-23 (Ex. 7), DOI-BLM-NM-F010-2016-0007-EA at 23 (Ex. 8), DOI-BLM-NM-F010-2016-0054-EA at 31-32 (Ex. 9), DOI-BLM-NM-F010-2016-0229-EA at 32-33 (Ex. 10), DOI-BLM-NM-F010-2016-0251-EA at 41 (Ex. 11), DOI-BLM-NM-F010-2016-0252-EA at 37-38 (Ex. 12), and DOI-BLM-NM-F010-2018-0035-EA at 14 (Ex. 31). Fifteen of the EAs use identical language to the previous nine, except that they cite the 2016 Air Resources Technical Report rather than the 2014 version. *See* DOI-BLM-NM-F010-2016-0260-EA at 34 (Ex. 13), DOI-BLM-NM-F010-2017-0015-EA at 40-41 (Ex. 14), DOI-BLM-NM-F010-2017-0018-EA at 24-25 (Ex. 16), DOI-BLM-NM-F010-2017-0028-EA (Ex. 17 at 38), DOI-BLM-NM-F010-2017-0029-EA at 30 (Ex. 18), DOI-BLM-NM-F010-2017-0038-EA at 24-25 (Ex. 19), DOI-BLM-NM-F010-2017-0039-EA at 37-38 (Ex. 20), DOI-BLM-NM-F010-2017-0042-EA at 37-38 (Ex. 21), DOI-BLM-NM-F010-2017-0057-EA at 36 (Ex. 22), DOI-BLM-NM-F010-2017-0058-EA at 37-38 (Ex. 23), DOI-BLM-NM-F010-2017-0085-EA at 37-38 (Ex. 24), DOI-BLM-NM-F010-2017-0126-EA at 29 (Ex. 28), DOI-BLM-NM-F010-2018-0017-EA at 14-15 (Ex. 30), DOI-BLM-NM-F010-2018-0047-EA at 16 (Ex. 33), and DOI-BLM-NM-F010-2018-0103-EA at 18 (Ex. 35). Three EAs provide substantively similar but not identical analysis of cumulative air impacts, but do not teir to the 2003 RMP explicitly. DOI-BLM-NM-F010-2017-0017-EA at 27-28 (Ex. 15), DOI-BLM-NM-F010-2017-0115-EA at 11 (Ex. 27), DOI-BLM-NM-F010-2018-0016-EA at 15-16 (Ex. 29).

By requiring analysis of the "cumulative impacts [that] result from individually minor but collectively significant actions taking place over a period of time," NEPA ensures that agency decisions affecting the environment are not made in a vacuum. 40 C.F.R. § 1508.7; *see also Wilderness Workshop v. BLM*, 531 F.3d 1220, 1228 n.8 (10th Cir. 2008); *Northern Plains Res. Council v. Surface Trsp. Bd.*, 668 F.3d 1067, 1078-79 (9th Cir. 2011) (holding an agency is not permitted to pretend its project "operat[ed] in a vacuum" by ignoring reasonably foreseeable cumulative impacts of nearby drilling). Such analysis prevents agencies from undertaking a piecemeal review of environmental impacts. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306-07 (9th Cir. 2003). Yet a piecemeal review of individual Mancos Shale wells is all BLM has ever offered. The Tenth Circuit rejected this approach in *Diné C.A.R.E.*, 923 F.3d at 857, and BLM's continued use of this approach must similarly be rejected here. Accordingly, Citizen Groups are likely to succeed on the merits.

## II.   Citizen Groups Will Suffer Immediate and Irreparable Injury

To constitute irreparable harm, an injury must be "certain, great, actual and not theoretical." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014) (citations omitted); *see also Winter*, 555 U.S at 22 (irreparable injury must be "likely" but for an

---

Three other EAs provide tables with estimated emissions in the FFO and state: "The February 2018 Reasonable Foreseeable Development Scenario for Oil and Gas Activities (RFD 2018) estimates that there could be an additional 3,200 wells drilled by 2037 (Crocker and Glover 2018)." DOI-BLM-NM-F010-2018-0042-EA at 22 (Ex. 32), DOI-BLM-NM-F010-2018-0063-EA at 22 (Ex. 34), and DOI-BLM-NM-F010-2019-0047-EA at 19 (Ex. 36). DOI-BLM-NM-F010-2018-0063-EA continues with the statement "The CARMMS states that by 2025 the additional wells could produce 3,184 tons per year (tpy) of NOx and 6,459 tpy of VOCs, which is 4.6% and 8%, respectively of the current NOx and VOCs emissions (BLM 2017). The implementation of the Proposed Action could result in a 0.09% and 0.02% increase in NOx and VOCs to the current emissions within the FFO. The Air Resources Technical Report (BLM 2016) discusses the relationship of past, present, and future activities in the Four Corners Area that contribute to air quality impacts including electricity generation stations, fossil fuel industries, and vehicle travel." at 22-23 (Ex. 34).

injunction). A plaintiff satisfies the irreparable harm requirement by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1258 (10th Cir. 2003). As the Supreme Court recognizes: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco v. Vill. of Gambell,* 480 U.S. 531, 545 (1987); *see also, Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1440 (10th Cir. 1996) (accord). While "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure … [p]laintiffs must still make a specific showing that the environmental harm results in irreparable injury to their specific environmental interests." *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002) (abrogated on other grounds).

Here, Citizen Groups demonstrate irreparable harm from: (1) damage and permanent destruction of environmental resources from ground disturbance, road-building, drilling, and production associated with APD development; (2) health impacts and increased concerns over potential health impacts from APD development; and (3) APD development occurring in the absence of environmental review required by NEPA, which undermines the statute's purpose that agencies "look before they leap", unleasing a "bureaucratic steamroller" that makes it less like Citizen Groups will obtain any meaningful on-the-ground relief if they prevail on the merits.

*Diné C.A.R.E. v. Jewell* considered irreparable harm in this specific context and concluded that irreparable harm would result from continued development of the challenged APDs absent preliminary relief. *Diné C.A.R.E. v. Jewell*, 2015 WL 4997207 (D.N.M. Aug. 14, 2015), *aff'd,* 839 F.3d 1276 (10th Cir. 2016). There, the Court summarized: "the harms that the requested injunction seeks to prevent would be irreparable. Environmental harms are often

irreparable, and the particular environmental injury in this case—that associated with fracking—is irreversible once a well is fracked." *Id.* at *1. The Court later concluded that "[a]ny fracking-related environmental impacts that accrue during the pendency of this case—and it is undisputed that such impacts exist—would be irreversible." *Id.* at *46. Because these conclusions are based on similar facts as are present in the current case, the Court's conclusion that APD development would cause irreparable harm is also true in the present case.

###   A.   People and the Environment Will Be Irreparably Harmed by Continued and Future Horizontal Drilling and Hydraulic Fracturing of the Mancos Shale.

Courts have consistently found irreparable harm where the authorized activity will result in impacts to the natural environment—the precise type of harm threatened here by fracking the Mancos Shale wells challenged here. For example, *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, found irreparable harm from drilling two exploratory oil and gas wells, disturbing 14 acres of public lands, because such development would threaten, *inter alia*: "water for the community, clean air, and [a] large expanse of undeveloped land with a significant 'sense of place' and quiet[,]" and because plaintiffs "have interests in the water, wildlife, air, solitude and quiet, and natural beauty [the area] provides." 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009).[13] The court specifically noted that individuals would be affected "by noise and their aesthetic interests … by increased traffic and drill rigs." *Id.* Moreover, *San Luis Valley* enjoined well construction even where impacts to environmental resources might be temporary and disturbance eventually reclaimed. *Id.* at 1241. *Diné C.A.R.E. v. Jewell* provided:

---

[13] *See also Anglers of the AU Sable v. U.S. Forest Serv.,* 402 F. Supp. 2d 826, 837 (E.D. Mich. 2005) (staying development of a single 3.5-acre exploration well based on irreparable harm from destruction of "the quiet and peaceful aspects" of the tract; altered wildlife patterns; effects on predator-prey relationships; species habitat disturbance; and lost recreational opportunities.).

> Plaintiffs have pointed to a number of ways in which even properly functioning
> directionally drilled and fracked wells produce environmental harms. These are
> cited in the Court's findings of fact, and include air pollution, water usage, and
> surface impacts.

2015 WL 4997207 *48. Other courts have similarly found irreparable harm where the proposed

action would impair the natural setting or result in harm to physical or aesthetic values in the

environment, none of which are compensable with money damages.[14]

Here, Citizen Groups face each of these discrete environmental harms through BLM's

approval of at least 255 new individual Mancos Shale drilling permits, which add to a legacy of

environmental harm across the Greater Chaco Landscape from drilling over 40,000 historic wells

in the San Juan Basin.[15] The individual FONSIs for each of the 32 EAs purport to justify well

construction, hydraulic fracture stimulation, well pad, road, and pipeline construction, as well as

new facility installation and expansion of existing facilities—actions that BLM never considered

on a cumulative basis.[16] These 255 horizontal Mancos Shale wells will result in cumulative,

irreparable harms to environmental resources including surface impacts, increased air pollutant

emissions, venting or burning of nitrogen and natural gas, Volatile Organic Compound ("VOC")

and Hazardous Air Pollutants ("HAPs") emissions, use millions of gallons of freshwater,

---

[14] *See Colorado Wild,* 523 F. Supp. 2d 1213, at 1220 (D. Colo.  2007) (finding irreparable harm
due to "environmentally destructive road construction" and associated site development); *Nat'l
Wildlife Fed'n v. Burford*, 835 F.2d 305, 323 (D.C. Cir. 1987) (issuing a preliminary injunction
where "any mining or leasing could cause irreparable injury by permanently destroying wildlife
habitat, air and water quality, natural beauty, and other environmental and aesthetic values and
interests."); *Davis*, 302 F.3d at 1115-16 (finding irreparable harm to recreational uses by
"disrupt[ing] the natural setting and feeling" of the affected area).

[15] *See* Declaration of Kendra Pinto (Pinto Dec.) (Ex. 37) at ¶¶ 6-8; Declaration of Mike Eisenfeld
(Eisenfeld Dec.) (Ex. 39) at ¶¶ 2-11;  Declaration of Sonia Grant (Grant Dec.) (Ex. 40) at ¶¶ 9,
13-15; Declaration of Miya King-Flaherty (King-Flaherty Dec.) (Ex. 42) at ¶¶ 5, 7; and
Declaration of Jeremy Nichols (Nichols Dec.) (Ex. 45) at ¶¶ 4, 8-18.

[16] *See* Eisenfeld Dec. at ¶¶ 11-12;  Grant Dec. at ¶¶ 13-15; King-Flaherty Dec. at ¶ 21; and
Nichols Dec. at ¶¶ 4, 19.

production facility impacts involving several thousand more tanks and compressors, habitat fragmentation and loss of up to 31 times the area of physical disturbance, and truck traffic of 2,300 round trips per well.[17] BLM has never analyzed the cumulative impacts of this scale of development across the Greater Chaco Landscape.

These impacts cause or contribute to specific harms suffered by individual members of Citizen Groups, including, for example: degradation of their use and enjoyment of Chaco Culture National Historical Park, the surrounding areas, and cultural sites and resources; impacts to air quality and water quality; disturbance from flaring; impacts to the visual landscape and night skies; a reduction in solitude and quiet; impacts to the grazing of sheep and cattle; increased noise; increases in traffic; increases in violent crime; and disruptions of spiritual experiences associated with the natural landscape and traditional cultural and ceremonial practices.[18] These environmental harms are irreparable. *See Diné C.A.R.E. v. Jewell,* 2015 WL 4997207 *48.

### B. The Health of Diné and Other Community Members Is Threatened by Ongoing and Future Development of the Mancos Shale.

In addition to the irreparable environmental harms suffered by Citizen Groups' members from degradation of the Greater Chaco Landscape, Citizen Groups' members' health and wellbeing are threatened by the challenged drilling approvals. In similar cases where a proposed action threatens to adversely affect human health, courts have issued preliminary injunctions. For example, in *Sierra Club v. U.S. Dep't of Agric.*, the court issued a preliminary injunction where the proposed action "will emit substantial quantities of air pollutants that endanger human health

---

[17] *See* Pinto Dec. at ¶¶ 3-12; Eisenfeld Dec. at ¶¶ 2-11;  Grant Dec. at ¶¶ 9-11; King-Flaherty Dec. at ¶¶ 9-14, 17; Declaration of Teresa Seamster (Seamster Dec.) (Ex. 44) ¶ 14; and Nichols Dec. at ¶¶ 17-18.

[18] *See* Pinto Dec. at ¶¶ 3-12; Eisenfeld Dec. at ¶¶ 2-11;  Grant Dec. at ¶¶ 10-15; King-Flaherty Dec. at ¶¶ 9-11, 12, 17, 19-20; Seamster Dec. at ¶ 13; and Nichols Dec. at ¶¶ 12-18.

and the environment and thereby cause irreparable harm." 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (finding that "remedies available at law, such as monetary damages, are inadequate to compensate for th[e] injury") (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010)).[19]

The harm to public health from oil and gas operations is well documented and acknowledged by the scientific and medical communities.[20] For example, hydraulic fracturing involves the use of chemicals known to impact and cause long-term harm to organs and body systems, including impacts to skin, eyes, sensory organs, the respiratory system, the gastrointestinal system, and the liver.[21] Moreover, oil and gas operations result in elevated concentrations of health-damaging air pollutants such as VOCs, aromatic hydrocarbons, particulate matter, and ground level ozone.[22] Hydraulic fracturing also results in elevated risk of water contamination with a significant potential to lead to adverse health outcomes.[23]

Here, Citizen Groups' members already suffer from exposure to these adverse health conditions, which the 255 proposed Mancos Shale wells threaten to exacerbate in the absence of preliminary relief.[24] Such adverse human health impacts are irreparable.

---

[19] *See also, Fairway Shoppes Joint Venture v. Dryclean U.S.A. of Florida, Inc.,* 1996 WL 924705 at *10 (S.D. Fla. 1996) ("the requirement of irreparable harm for a preliminary injunction is satisfied by showing a threat of harm to the public health or environment: actual harm to human health or the environment is not required to preliminarily enjoin the polluter.").

[20] *See* Seamster Dec. at ¶¶ 9-14.

[21] *See Id.*

[22] *See Id.*

[23] *See* Seamster Dec. at ¶ 9.

[24] *See* Pinto Dec. at ¶¶ 5, 8-10; Eisenfeld Dec. at ¶ 10-11;  Grant Dec. at ¶¶ 11-12; King-Flaherty Dec. at ¶ 12-14, 17; and Seamster Dec. at ¶ 13.

### C. BLM's Authorization of Mancos Shale Drilling Permits Absent NEPA Compliance Threatens Irreparable Harm.

Finally, Citizen Groups will suffer irreparable harm from drilling authorizations that fail to comply with NEPA. As a procedural statute, NEPA's fundamental purpose is to influence the agency's decisionmaking process "by focusing the [federal] agency's attention on the environmental consequences of a proposed project," so as to "ensure[ ] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Methow Valley,* 490 U.S. at 349. *See also Sierra Club v. Hodel,* 848 F.2d 1068, 1097 (10th Cir. 1988). The "assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made." *Richardson*, 565 F.3d at 718; 42 U.S.C. § 4332(2)(C)(v); 40 C.F.R. §§ 1501.2, 1502.22.

Accordingly, courts routinely issue preliminary injunctions where, as here, the agency fails to comply with the required NEPA procedure. *Davis,* 302 F.3d at 1114 ("In mandating compliance with NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment."). "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir. 1989) (citations omitted). As explained by in *Colorado Wild v. U.S. Forest Service*:

> Thus, the irreparable injury threatened here is not simply whatever ground-disturbing activities are conducted in the relatively short interim before this action is decided, it is the risk that in the event the [agency's NEPA decisions] are overturned and the agency is required to 'redecide' the [ ] issues, the bureaucratic

> momentum created by Defendants' activities will skew the analysis and decision-making of the [agency] towards its original, non-NEPA compliant [ ] decision.

523 F. Supp. 2d 1213, 1221 (D. Colo. 2007); *see also, Marsh,* 872 F.2d at 504 ("The difficulty of stopping a bureaucratic steam roller, once started ... seems to us ... a perfectly proper factor for a district court to take into account ... on a motion for preliminary injunction.").[25]

If Citizen Groups ultimately prevail on the merits, NEPA compliance after APD development has begun will make an unbiased environmental analysis of the decisions virtually impossible due to the bureaucratic momentum for development already underway. Citizen Groups attest to the irreparable harm they will suffer from APD development absent the thorough environmental analysis required by NEPA. In spite of BLM's recognition that unanalyzed environmental impacts could occur from Mancos shale development, 79 Fed. Reg. 10,548, and the Tenth Circuit's adverse decision in *Diné C.A.R.E.,* 923 F.3d at 857, explicitly rejecting BLM's NEPA analysis for Mancos Shale wells, the agency has defiantly maintained its approach of approving hundreds of Mancos Shale drilling permits without ever conducting the necessary cumulative analysis.[26] *See Methow Valley*, 490 U.S. at 349 (agencies must "look before they leap"). Citizen Groups thus face irreparable harm from the inability to participate effectively in agency environmental evaluations—as well as irreparable environmental and

---

[25] *See also San Luis Valley*, 657 F. Supp. 2d at 1241-42 ("Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [the industry proponent] were permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking."); *Save Strawberry Canyon v. Dep't of Energy,* 613 F.Supp.2d 1177, 1187 (N.D. Cal. 2009) ("There is no doubt that the failure to undertake an EIS when required to do so constitutes procedural injury to those affected by the environmental impacts of a project.").

[26] *See* Guarino Dec. at ¶ 48 (Ex 47).

health harms—if this Court allows APD development to continue while litigation of the merits of the NEPA violations proceeds.[27]

### III.    The Balance of Equities Tips Strongly in the Plaintiffs' Favor

Permanent harm to the environment, human health, and Citizen Groups' legal rights outweigh any ostensible harm BLM may incur by maintaining the status quo, as well as the temporary, conditional, and purely economic harm to drilling proponents. Any injury incurred by BLM through a delay in drilling, or any prospective harm to drilling proponents, is both speculative and pales in comparison to the irreparable harm faced by Citizen Groups, detailed above. As the Tenth Circuit has consistently recognized, "financial concerns alone generally do not outweigh environmental harm." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004).[28]  This case is no exception.

Moreover, the Tenth Circuit has already determined BLM's NEPA analysis of similar APD EAs to be unlawful for failing to adequately consider cumulative impacts. *Diné C.A.R.E.,* 923 F.3d at 857. The 32 EAs challenged here suffer the same fatal defect. BLM has nevertheless refused to cure its flawed approach, and continues to approve Mancos Shale wells without considering the cumulative impacts from all 3,960 foreseeable Mancos Shale wells. Without preliminary relief, APD development will continue.

The Tenth Circuit's chosen remedy for this NEPA violation was vacatur of BLM's drilling approvals. *Id.* at 859. In this context, that requires new NEPA analysis before any APD can be re-issued and, where drilling or ground-disturbing activity has already commenced

---

[27] *See* Pinto Dec. at ¶¶ 3-12; Eisenfeld Dec. at ¶¶ 11-12; Grant Dec. at ¶¶ 10-12; King-Flaherty Dec. at ¶ 21; Seamster Dec. at ¶ 13; and Nichols Dec. at ¶¶ 12-18.

[28] *See also Amoco,* 480 U.S. at 545; *Acierno v. New Castle Cnty.,* 40 F.3d 645, 653 (3d Cir. 1994); *San Luis Valley,* 657 F.Supp.2d at 1242.

pursuant to BLM's unlawful approvals, the cessation of development activity and the shutting in

of wells, even if those wells were already in production. All such activity represents lost time and

investment for the parties involved. While commencement of this litigation has put industry

proponents on notice that any such investment would be at stake, maintaining the status quo

pending ultimate resolution remains in the best interest of all parties.

The balance of harms must also be considered in the context of the challenged activity,

which is subject to compliance with NEPA and the protection of natural resources,[29] and

therefore also tips decidedly in favor of Citizen Groups. Each drilling approval violates NEPA

by failing to consider the cumulative impacts from 3,960 Mancos Shale wells, and thus BLM's

environmental mandate cannot be satisfied. *See Marsh v. Or. Natural Res. Council*, 490 U.S.

360, 371, (1989) (holding "NEPA ensures that the agency will not act on incomplete

information, only to regret its decision after it is too late to correct."). *See also Grand Canyon

Trust v. Federal Aviation Admin.,* 290 F.3d 339, 342 (D.C. Cir. 2002) (in evaluating the

environmental consequences of a proposed action, the agency "must give a realistic evaluation of

the total impacts and cannot isolate a proposed action, viewing it in a vacuum.").

Finally, more than economic harm must be shown to outweigh certain environmental

destruction and harm to human health. *Northern Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471

(9th Cir. 1986). *See also, Acierno,* 40 F.3d at 653 (recognizing that "[e]conomic loss does not

constitute irreparable harm…"); *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007)

---

[29] 43 C.F.R. § 3161.2 (requiring "all [oil and gas] operations be conducted in a manner which protects other natural resources and the environmental quality, protects life and property…"); 43 C.F.R. § 3162.1(a) ("The [oil and gas] operating rights owner or operator … shall comply with applicable laws and regulations;" including "conducting all operations in a manner … which protects other natural resources and environmental quality."). *See also* 30 U.S.C. § 226(p)(2)(A) (requiring BLM to defer APD approval where it has not sufficiently completed the NEPA process, or where approval would not be in compliance with other applicable laws).

("We have held time and again that the public interest in preserving nature … outweighs economic concerns"). This is particularly true where, as here, *permanent* environmental destruction and harm to human health must be weighed against the *temporary* suspension of unlawfully approved drilling permits. Critically, the Mancos Shale drilling permits at issue—and any economic gains therefrom—are by law and rule expressly subject to and conditioned upon compliance with NEPA.[30] Put differently, oil and gas lessees have neither the legal right nor the legal expectation to drill before BLM fully complies with NEPA. In an analogous case, *San Luis Valley* halted construction of a drilling project because the "likelihood of irreparable environmental injury and the risk of uninformed decisionmaking regarding such delicate and intertwined natural resources, outweighs any potential harm accruing to Defendants." 657 F.Supp.2d at 1242. There, the court concluded that the balance of harms favored the environmental plaintiffs because "harm, delay in drilling the exploratory wells, is not irreparable in that it can be compensated by money damages." *Id.*[31] Similarly, any monetary interest that BLM or drilling proponents may allege cannot outweigh the injuries that Citizen Groups would suffer in the absence of an injunction. Furthermore, an expedited briefing schedule would minimize disruption to operators. The balance of equities supports preliminary relief.

---

[30] *See* 30 U.S.C. § 226 (p)(2) (requiring BLM to defer APD approval where it has not sufficiently completed the NEPA process); 43 C.F.R. § 3162.1(a) (requiring oil and gas operating rights to comply with applicable laws and regulations).

[31] *See also Colorado Wild,* 523 F.Supp.2d at 1222 ("[E]conomic harm, however, is not irreparable and does not outweigh the serious risk that irreparable environmental harm will result if [the project proponent] is allowed to proceed with [development] in reliance on the [agency's] decision."); *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1125 (9th Cir.2005) (affirming preliminary injunction in NEPA case because, while developer "may suffer financial harm" if injunction issued, balance of harms favored issuance of injunction where irreparable harm was likely if development was allowed to proceed without proper review).

## IV.    Granting Preliminary Relief is in the Public Interest

The public interest is strongly served through the protection of people and the

environment, as well as by ensuring BLM's compliance with federal law. These interests are

threatened by ongoing and future drilling of Mancos Shale wells. As recognized in *Colorado*

*Wild,* "[t]here is an overriding public interest in the preservation of biological integrity and the

undeveloped character of the Project area that outweighs public or private economic loss in this

case." 299 F.Supp.2d 1184, 1190-91 (2004).[32] Likewise, the "protection of human health, safety

and the affected communities also serves the public interest." *San Luis & Delta-Mendota Water*

*Auth. v. Locke*, 2010 WL 500455, at *8 (E.D. Cal. 2010). An injunction in this case is vital to

protecting the public interest by preventing ongoing environmental harm and public health

impacts from development of Mancos Shale wells.

Similarly, "the public has an interest in ensuring that federal agency actions … comply

with the requirements of NEPA." *Sierra Club*, 841 F. Supp. 2d at 360. As recognized in

*Colorado Wild*: "The public has an undeniable interest in the [agency's] compliance with

NEPA's environmental review requirements and the informed decision-making that NEPA is

designed to promote." 523 F.Supp.2d at 1223. Indeed, the refusal of administrative agencies to

comply with environmental laws "invokes a public interest of the highest order: the interest in

having government officials act in accordance with law." *Seattle Audubon Society v. Evans,* 771

F. Supp. 1081, 1096 (W.D. Wash. 1991).

While Defendants may assert that oil and gas development is in the public interest, the

---

[32] *See also Wyo. Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1250 (10th Cir. 1973)
("[T]here is an overriding public interest in preservation of the undeveloped character of the area
recognized by the statute.") *overruled on other grounds by Vill. of Los Ranchos De Albuquerque
v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

approval of such development is subject to and does not supersede the public's interest in

environmental protection, public health, and compliance with federal law. *See* 43 C.F.R. §§

3161.2 (a); 30 U.S.C. § 226(p)(2)(A). On this point, in a case involving natural gas development

on public lands, the District of Wyoming held:

> The Court is cognizant of the importance of mineral development to the economy
> of the State of Wyoming. Nevertheless, mineral resources should be developed
> responsibly, keeping in mind those other values that are so important to the people
> of Wyoming, such as preservation of Wyoming's unique natural heritage and
> lifestyle. The purpose of NEPA … is to require agencies … to take notice of these
> values as an integral part of the decisionmaking process.

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F.Supp.2d 1232, 1260 (D.Wyo. 2005).

Similarly, here, the public interest in protecting our environment, human health, and ensuring

lawful agency decisionmaking strongly favors the need for a preliminary injunction, particularly

given the strong likelihood of success on the merits of this case.

V.    **Requiring Citizen Groups to Pay a Substantial Bond Would Chill or Preclude
      Access to the Courts and Frustrate NEPA's Purposes**

If this Court grants Citizen Groups' Motion for preliminary relief, Citizen Groups

respectfully request that the Court impose no bond or a nominal bond under the public interest

exception to Fed. R. Civ. P. 65(c). Although Rule 65(c) requires a security to be posted in

conjunction with a preliminary injunction, "the trial judge has wide discretion in the matter of

requiring security" and under some circumstances, "no bond is necessary." *Continental Oil v.

Frontier Refining*, 338 F.2d 780, 782 (10th Cir. 1964). Under Tenth Circuit precedent,

"[o]rdinarily, where a party is seeking to vindicate the public interest served by NEPA, a

minimal bond amount should be considered." *Davis*, 302 F.3d at 1126. Because Citizen Groups

here are seeking to "vindicate the public interest served by NEPA," a nominal or no bond is

appropriate. *Id.*; *Colorado Wild*, 523 F. Supp. 2d at 1230-31.

Plaintiffs are not-for-profit groups whose missions involve protecting the environment and public health and vindication of the public interest; none of the plaintiffs has any financial interest in the outcome of this case.[33] If substantial bonds were regularly required from these groups in order to obtain preliminary relief, they would be precluded from seeking such relief— even when a court would otherwise find it appropriate.[34] Because a preliminary injunction is necessary to prevent the very harm that necessitated this suit, until the court can rule on the merits of this case, denial of preliminary relief would deny Plaintiffs effective access to judicial review of illegal agency actions. As the Tenth Circuit implicitly recognized in *Davis*, such a result would defeat NEPA's purpose.

## CONCLUSION

Because Citizen Groups have satisfied each element for preliminary relief, they respectfully request the Court grant their motion for a TRO and thereby maintain the status quo during the pendency of this case. Citizen Groups request the Court order BLM to suspend all APD approvals challenged in this case, and enjoin all activities on the challenged APDs.

Respectfully submitted this 1st day of August 2019,

/s/ Kyle J. Tisdel
Kyle J. Tisdel
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Suite 602

---

[33] *See* Declaration of Carol Davis (Davis Dec.) (Ex. 38) at ¶¶ 3-5; Declaration of Mark Pearson (Pearson Dec.) (Ex. 41) at ¶¶ 4-5;  Declaration of Aaron Isherwood (Isherwood Dec.) (Ex. 43) at ¶¶ 4 & 7; and Declaration of John Horning (Horning Dec.) (Ex. 46) at ¶¶ 3 & 9.

[34] Davis Dec. at ¶¶ 6-8; Pearson Dec. at ¶¶ 6-8;  Isherwood Dec. at ¶¶ 9-10; and Horning Dec. at ¶ 11.

Taos, New Mexico 87571
(p) 575.613.8050
tisdel@westernlaw.org

/s/ Julia Guarino
Julia Guarino
WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Suite 602
Taos, New Mexico 87571
(p) 575.224.6205
guarino@westernlaw.org

*Counsel for Plaintiffs*

/s/ Daniel Timmons
Daniel Timmons
WILDEARTH GUARDIANS
301 N. Guadalupe Street, Suite 201
Santa Fe, NM  87501
(p) 505.570.7014
dtimmons@wildearthguardians.org

/s/ Samantha Ruscavage-Barz
Samantha Ruscavage-Barz
WILDEARTH GUARDIANS
301 N. Guadalupe Street, Suite 201
Santa Fe, NM 87501
(p) 505.401.4180
sruscavagebarz@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*

/s/ Karimah Schoenhut
Karimah Schoenhut (D.C. Bar No. 1028390)
(appearing by association with Federal Bar
member Kyle J. Tisdel pursuant to L.R. 83.3(a))
SIERRA CLUB
50 F Street NW, 8th Floor
Washington DC 20001
(p) 202.548.4584
karimah.schoenhut@sierraclub.org

*Counsel for Plaintiff Sierra Club*

27

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
was served on all counsel of record through the Court's ECF system on this 1st day of August
2019.

<u>/s/ Kyle Tisdel</u>