**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

DINÉ CITIZENS AGAINST RUINING
OUR ENVIRONMENT, *et al.*,

      Plaintiff,

                                      Case No. 1:19-cv-00703-WJ-JFR

      v.

DAVID LONGLY BERNHARDT,
in his official capacity as Secretary of
the United States Department of the
Interior, *et al.*,

       Defendants.

**FEDERAL DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION, AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    I.     NATIONAL ENVIRONMENTAL POLICY ACT ................................................ 2

    II.    OIL AND GAS DEVELOPMENT IN THE SAN JUAN BASIN ........................ 3

    III.   PRIOR LITIGATION OF APDS IN THE SAN JUAN BASIN ........................... 6

    IV.   EAS CHALLENGED IN THE CURRENT LITIGATION ................................... 7

STANDARDS OF REVIEW ............................................................................................... 8

    I.     PRELIMINARY INJUNCTIONS ARE EXTRAORDINARY REMEDIES ........ 8

    II.    REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT
          ("APA") ................................................................................................................ 9

ARGUMENT ..................................................................................................................... 11

    I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF
          THEIR CLAIMS ................................................................................................ 11

         A.    The Air Analysis in the Challenged EAs Complies with NEPA .............. 11

         B.    The Challenged EAs Adequately Address Other Aspects of
              Hydraulic Fracturing ................................................................................ 13

         C.    The Scope of Relief Plaintiffs Seek is Not Supported by the
              Actions Challenged .................................................................................. 14

    II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE INJURY ...... 15

    III.   THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH
          AGAINST A PRELIMINARY INJUNCTION ................................................... 18

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)................................................................................................. 9, 20

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)..................................................................................................... 10

*Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*,
  111 F.3d 1485 (10th Cir. 1997) ................................................................................. 8, 9

*Citizens Against Ruining Our Env't v. Jewell*,
  No. CIV 15-0209 JB/SCY, 2015 WL 4997207 (D.N.M. Aug. 14, 2015) ......................... 15, 18

*Citizens Against Ruining Our Env't v. Jewell*,
  No. CIV 15-0209, 2015 WL 6393843 (D.N.M. Sept. 16, 2015)............................................... 6

*Dine Citizens Against Ruining Our Env't v. Bernhardt (Diné CARE I)*,
  923 F.3d 831 (10th Cir. 2019) ........................................ 1, 6, 7, 8, 11, 12, 14, 16, 19

*Diné Citizens Against Ruining Our Env't v. Jewell (Diné CARE 2016)*,
  839 F.3d 1276 (10th Cir. 2016) ............................................ 4, 6, 9, 11, 15, 19, 20, 21

*Friends of the Earth v. Hintz*,
  800 F.2d 822 (9th Cir. 1986) ..................................................................................... 10

*Greater Yellowstone Coal. v. Flowers*,
  359 F.3d 1257 (10th Cir. 2004) ................................................................................. 3, 4

*GTE Corp. v. Williams*,
  731 F.2d 676 (10th Cir. 1984) ..................................................................................... 17

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ................................................................................. 15

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)..................................................................................................... 11

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)............................................................................................... 10, 15

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)............................................................................................... 10, 11

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997)....................................................................................................... 8

*Nat. Res. Def. Council v. Kempthorne*,
  525 F. Supp. 2d 115 (D.D.C. 2007)............................................................................. 22

*Nat'l Audubon Soc'y v. Dep't of Navy*,
  422 F.3d 174 (4th Cir. 2005) ..................................................................................... 20

NEPA. *Diné Citizens Against Ruining Our Env't v. Jewell (Diné CARE 2018)*,
312 F. Supp. 3d 1031 (D.N.M. 2018) ........................................................ 1, 10, 13, 14, 15, 18

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......................................................................................................... 2

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*,
657 F. Supp. 2d 1233 (D. Colo. 2009) ............................................................................ 22

*SCFC ILC, Inc. v. Visa USA, Inc.*,
936 F.2d 1096 (10th Cir. 1991) ........................................................................................ 8

*Sierra Club, Inc. v. Bostick*,
539 F. App'x 885 (10th Cir. 2013) .................................................................................. 20

*Sprint Spectrum, L.P. v. State Corp. Comm'n of Kan.*,
149 F.3d 1058 (10th Cir. 1998) ........................................................................................ 9

*Utah Envtl. Cong. v. Russell*,
518 F.3d 817 (10th Cir. 2008) .......................................................................................... 2

*Warm Springs Dam Task Force v. Gribble*,
621 F.2d 1017 (9th Cir. 1980) ........................................................................................ 10

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .......................................................................................................... 9

*Wilderness Workshop v. BLM*,
531 F.3d 1220 (10th Cir. 2008) ................................................................................. 20, 21

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ........................................................................................................ 9, 13

*Yakus v. United States*,
321 U.S. 414 (1944) ........................................................................................................ 22

**Statutes**

5 U.S.C. § 702 ...................................................................................................................... 9

5 U.S.C. § 704 ................................................................................................................ 10, 14

5 U.S.C. §§ 701-706 ............................................................................................................. 9

5 U.S.C. § 706(2)(A) .......................................................................................................... 10

16 U.S.C. § 410ii .................................................................................................................. 17

16 U.S.C. § 410ii(a) ............................................................................................................. 17

16 U.S.C. § 410ii(a)(3) ........................................................................................................ 17

16 U.S.C. § 410ii-5(c) .......................................................................................................... 17

42 U.S.C. § 1501.3 ................................................................................................................. 3

42 U.S.C. § 1501.4(b) ......................................................................................... 3

42 U.S.C. § 1501.4(c) ......................................................................................... 3

42 U.S.C. § 1501.4(e) ......................................................................................... 3

42 U.S.C. § 1508.9 .............................................................................................. 3

42 U.S.C. § 1508.9(a) ......................................................................................... 3

42 U.S.C. § 4332(2)(C) ....................................................................................... 2

42 U.S.C. § 4342 ................................................................................................. 2

42 U.S.C. §§ 4321-4370 ...................................................................................... 2

**Regulations**

40 C.F.R. § 1502.20 .......................................................................................... 13

40 C.F.R. § 1502.21 .......................................................................................... 12

40 C.F.R. § 1508.28 ............................................................................................ 4

40 C.F.R. §§ 1500.1–1518.4 ............................................................................... 2

## __EXHIBITS__[1]

Exhibit A:      Declaration of Mark Matthews ("Matthews Decl.")

Exhibit B:      Spreadsheet of APD Status

Exhibit C:      Map of Locations of Approved APDs

Exhibit D:      Excerpts from the 2003 Final Resource Management Plan and Environmental
                Impact Statement with Record of Decision ("2003 RMP/EIS")

Exhibit E:      Excerpts from 2018 Air Resources Technical Report

Exhibit F:      Excerpts from the Gold Book

Exhibit G:      Excerpts from Water Support Document

---

[1] In accordance with D.N.M.LR-Civ. 10.5, the parties have agreed that the Federal Defendants may exceed the page limits for exhibits.

v

# INTRODUCTION

This is the second round of litigation Plaintiffs have brought challenging Applications for Permit to Drill ("APD") approvals issued by the Bureau of Land Management ("BLM") in the Mancos Shale/Gallup formations ("Mancos Shale") of the San Juan Basin.  After losing the earlier case challenging more than 300 APDs in district court, Plaintiffs secured a remand and vacatur from the Tenth Circuit this past May on narrow grounds with regard to just five of the challenged Environmental Assessments ("EAs").  *See Dine Citizens Against Ruining Our Env't v. Bernhardt (Diné CARE I)*, 923 F.3d 831, 838 (10th Cir. 2019).  Plaintiffs have now returned to Court—just as BLM completed the additional National Environmental Policy Act ("NEPA") analysis required by the Tenth Circuit's decision—to challenge APDs approved under an additional thirty-two EAs prepared by BLM in the same region.

Plaintiffs' request for emergency relief is unwarranted:  BLM is already taking steps to review the thirty-two EAs at issue here, as well as other EAs for the Mancos Shale, to ensure that they do not suffer from the narrow issue identified by the Tenth Circuit in *Diné CARE I*.  Beyond the water quantity assessment identified by the Tenth Circuit as requiring additional analysis, the *Diné CARE I* district court correctly ruled that BLM had sufficiently analyzed the environmental impacts of the proposed actions and therefore complied with the NEPA.  *Diné Citizens Against Ruining Our Env't v. Jewell (Diné CARE 2018)*, 312 F. Supp. 3d 1031 (D.N.M. 2018), *aff'd in part, rev'd in part and remanded*, 923 F.3d 831 (10th Cir. 2019).

While BLM's review is underway, the equities counsel strongly in favor of maintaining the status quo and allowing on the ground activities to continue.  Plaintiffs are challenging BLM's routine review of APDs in a region where mineral development and hydraulic fracturing have been ongoing for over fifty years.  For many of the APDs that Plaintiffs challenge, the

approvals were granted years ago, the drilling and hydraulic fracturing process has already been completed, and the wells are already in production.  Because the vast majority of the environmental harms alleged by Plaintiffs—including water usage, surface disturbance, and air pollution—stem from the construction and drilling phase of oil and gas production, these APDs for producing wells in particular do not merit immediate injunctive relief.

Plaintiffs are not entitled to the temporary restraining order or preliminary injunction they seek because they cannot demonstrate that their alleged harms outweigh the injury an injunction would cause to BLM's and the public's interest in oil and gas development in the San Juan Basin.  Oil and gas development is vital to the local, state, and national economies, generating thousands of jobs and substantial revenues that in turn fund schools, hospitals, and other government services.  This Court should not allow Plaintiffs to stymie local and state economies based on misconceived notions about the incremental impacts of the wells at issue here.

## BACKGROUND

### I.    NATIONAL ENVIRONMENTAL POLICY ACT

NEPA, 42 U.S.C. §§ 4321–4370m, encourages informed decision-making by agencies and ensures the dissemination of relevant information to the public.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA is a procedural statute that prescribes the process by which an agency must make its decisions, but does not mandate particular substantive results.  *Id*. at 350–51; *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 821 (10th Cir. 2008).  NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

NEPA also established the Council on Environmental Quality, 42 U.S.C. § 4342, which adopted regulations governing federal agency compliance with the statute.  *See* 40 C.F.R. §§

2

1500.1–1518.4.  Under those regulations, an agency may prepare an EA to determine whether an action requires an EIS.  *Id.* §§ 1501.4(b), 1508.9.  An EA is "a concise public document" that serves to "[b]riefly provide sufficient evidence and analysis for determining whether" to prepare an EIS.  *Id.* § 1508.9(a).  If the EA concludes there will not be any significant environmental impact, the agency may issue a Finding of No Significant Impact ("FONSI") and is not required to prepare an EIS.  *Id.* §§ 1501.3, 1501.4(c), 1501.4(e), 1508.9; *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004).

## II.   OIL AND GAS DEVELOPMENT IN THE SAN JUAN BASIN

The San Juan Basin in northwestern New Mexico is one of the largest natural gas fields in the nation, and has been in production for more than sixty years.[2]  Excerpts from the 2003 RMP/EIS Record of Decision, attached as DEX D, at 1.  Since that time, over 37,000 oil and gas wells have been drilled in the Basin and over 27,000 wells are currently active.  Mathews Decl., attached as DEX A ¶ 22.  In 2017, these wells produced over 464 million cubic feet of gas and 5.9 million barrels of oil.  *Id.*  Through its Farmington, New Mexico Field Office ("FFO"), BLM manages the active oil and gas leases on federal land in the San Juan Basin.  *Id.* ¶ 3.  Since the 1950s, nearly every well in the San Juan Basin has been fracture stimulated.  *Id.* ¶ 39. The Mancos Shale is a geologic layer within the San Juan Basin.  *Id.*

BLM has a statutory responsibility under NEPA to analyze and document the direct, indirect, and cumulative impacts of federally authorized fluid mineral activities.  In 2003, BLM issued a Record of Decision adopting the Final RMP and Final EIS ("2003 RMP/EIS") for the San Juan Basin.  *See* DEX D at 1.  Since the 2003 RMP/EIS was adopted, only 4,000 wells have

---

[2] While the San Juan Basin extends into southern Colorado, Federal Defendants use the term in this brief to refer to the portion of the Basin in northwestern New Mexico.

3

been drilled in the area—approximately 41% of the 9,942 wells predicted and analyzed in the 2003 EIS. *See* DEX D at 3; DEX A, ¶ 29.[3]

Because the 2003 RMP/EIS is a programmatic document for the entire San Juan Basin, BLM prepares site-specific EAs when considering APDs for specific wells or clusters of wells. *See, e.g*, Pls.' Ex. 11 at 7. These EAs "tier" to the analyses in the 2003 EIS, meaning that they incorporate by reference the general discussions in the 2003 RMP/EIS. *See id.*; 40 C.F.R. § 1508.28. The EAs also include additional analyses of site-specific and cumulative impacts not addressed in the 2003 EIS, including impacts specific to horizontal drilling and fracking. *See, e.g*., Pls.' Ex. 11 at 13–15. Even after the EA is completed, a new well may not be drilled unless the operator first receives specific approval of its drilling plan through the submission of an APD to BLM. *Diné Citizens Against Ruining Our Env't v. Jewell (Diné CARE 2016)*, 839 F.3d 1276, 1280 (10th Cir. 2016).

Once BLM approves an APD, the lifecycle of a well can be divided into three general phases, each of which has different environmental impacts. The first is the construction and drilling phase. The majority of the surface disturbance activities and water usage occurs during this phase. *See, e.g.*, Pls.' Ex. 31 at 9; Pls.' Ex. 2 at 22–24; Water Support Document, attached as DEX G at 27–28. The location of the well is selected and roads are built to their drilling configuration. DEX A, ¶ 42; Excerpts from The Gold Book, attached a DEX F at 16–36. Air impacts are greater at the time of construction and drilling than at any other time in the well's

---

[3] In response to projections that the number of wells might ultimately exceed the 9,942 wells envisioned in the 2003 EIS and RMP, BLM prepared a new Reasonable Foreseeable Development Scenario to better predict the Mancos Shale's potential for oil and gas development. *See* Pls. Ex. 2; DEX A, ¶¶ 31–35. While the process of amending the RMP continues, *see* DEX A, ¶¶ 34, FFO continues to approve APDs in the Mancos Shale, because the total number of additional wells it has reviewed and approved to date is far below the number analyzed and approved in the RMP. *See id.* ¶ 29.

productive life due to the heavy construction equipment used to move dirt, and drill the well (the drilling rig), and truck traffic to transport equipment, workers, and fluids.  *See, e.g.*, Pls.' Ex. 11 at 39, 53; DEX A, ¶ 53.

Next, the well enters into the producing phase, during which the well is hooked up to tanks and pipelines and oil or gas begins to flow from the well.  By the time a well is producing, the surface-disturbance activities have already taken place.  *See* DEX F at 40–41.  Under BLM policy, surface disturbance must be further minimized by reclamation of all portions of the well site not needed for production operations within six months of initial production, in a practice known as interim-reclamation.  DEX F at 44–47; DEX A, ¶ 48.  After drilling, all areas of the well pad that are not needed for day to day operations are re-contoured back to the natural topography and reseeded.  DEX F at 45–46; DEX A, ¶ 48.  During this phase, comparatively little water is required because the completion (fracturing) process has already been completed.  *See* DEX A, ¶ 44.  Air impacts during production are limited and generally confined to any workover activities or the emissions from the truck used by the lease operator during weekly well visits.  *See* Excerpts from 2018 Air Resources Technical Report, attached as DEX E, at 34–35.  Production equipment such as compressors, dehydrators, and tanks all have an impact on air quality, though it is minimal compared to the more intense impacts of construction and drilling.  DEX A, ¶ 53.

The third phase for a well is for it to temporarily or permanently stop producing.  A well that has only stopped producing for a temporary period is referred to as "shut in," while a well that is permanently closed is referred to as "plugged and abandoned."  There may be some air impacts associated with machinery used to repair a shut in well or to plug and abandon a well,

but there are not meaningful surface impacts or water usage.  *See* DEX F at 43–49; DEX A, ¶¶ 20, 53, 72.

### III.     PRIOR LITIGATION OF APDS IN THE SAN JUAN BASIN

In 2015, Plaintiffs challenged BLM's issuance of hundreds of APDs in the San Juan Basin under NEPA and the National Historic Preservation Act ("NHPA").  *Diné CARE I*, 923 F.3d at 838.  Plaintiffs moved for a preliminary injunction, which the district court denied.  *See Diné Citizens Against Ruining Our Env't v. Jewell*, No. CIV 15-0209, 2015 WL 6393843 (D.N.M. Sept. 16, 2015).  The Tenth Circuit upheld the denial on appeal.  *Diné CARE 2016*, 839 F.3d 1276.  The district court then ruled against Plaintiffs on the merits and dismissed their claims with prejudice, and Plaintiffs appealed.  *See Diné CARE I*, 923 F.3d at 838.  On appeal, the Tenth Circuit affirmed the district court's dismissal of Plaintiffs' NHPA claims and their claim under NEPA that BLM had inadequately analyzed air impacts.  *Id.* at 854–56.  The Tenth Circuit did, however, determine that, as to five of the challenged EAs, BLM was arbitrary and capricious for failing to "consider the cumulative water use associated with the 3,960 reasonably foreseeable horizontal Mancos Shale wells."  *Id*. at 856.  The Tenth Circuit then "remand[ed] to the district court with instructions to vacate the FONSIs and APDs associated with [five of the challenged EAs], and to remand those EAs to BLM to conduct a proper NEPA analysis."  *Id*. at 859.

On May 20, 2019, BLM began preparing that additional NEPA analysis for four of the five vacated EAs.[4]  To supplement its NEPA analysis of the cumulative impacts to water resources, BLM identified likely sources of water for the relevant APDs and quantified the

---

[4] The project associated with the fifth EA was withdrawn by the project-proponent, and therefore was not re-analyzed.  DEX A, ¶ 58.

projected water consumption pertaining to each approved APD.  DEX A, ¶ 58.  BLM also

quantified the projected water consumption for the entire FFO region based on its most current

planning documents.  *Id.*  BLM published the 2019 Water Support Document supporting its

analysis online on July 15, 2019.   DEX A, ¶ 59–60; DEX G at 1.  BLM then posted the new

draft analysis along with an un-signed FONSI for public comment from June 28 through July 10,

2019.  DEX A, ¶ 61.  After responding to the only public comment received, from Plaintiff

WildEarth Guardians, BLM finalized and signed the Decision Records on August 2, 2019.  *Id.*

The APDs for the subject wells were then re-authorized on August 2, 2019.  *Id.*  BLM sent a

letter notifying affected operators and lease holders on August 2, 2019 documenting BLM's

decision, and allowing operators to resume production.  *Id.*

## IV.   EAS CHALLENGED IN THE CURRENT LITIGATION

On August 1, 2019, Plaintiffs filed this suit challenging BLM's decision to approve "at

least 255" APDs.  Pet. for Review of Agency Action ¶ 1, ECF No. 1 ("Pet.").  They contend that

the thirty-two underlying EAs,[5] which form the basis for the challenged drilling permits, fail to

"analyze the cumulative impacts of the proposed actions based on past, present, and foreseeable

Mancos Shale development across the Greater Chaco Landscape."  *Id.* ¶¶ 1, 85.  Specifically,

Plaintiffs argue that BLM's analyses of air and water resources and the impacts of hydraulic

fracturing are insufficient.  *Id.* ¶¶ 86–87.

Although the thirty-two EAs analyze the impacts of 271 wells, DEX A, ¶ 66, to date,

only 101 APDs have been approved by BLM.[6]  Spreadsheet of APD Status, attached as DEX B

---

[5]  None of these APDs or EAs were at issue in *Dine CARE I.*

[6]  An EA may analyze more wells than have actually been approved or submitted.  For example,
one EA may analyze impacts of twelve potential future wells, but BLM may have only approved
three APDs to-date because the project proponent has only submitted three APDs to-date.  The

at 65–66.  Operators have two years to commence drilling after approval of an APD, but may seek a two-year extension.  DEX A, ¶ 65.  If an operator does not commence drilling within that time, the APD expires and an operator must submit a new APD in order to drill.  *Id.*  Of these 101 approved wells, forty-two have yet to be drilled, seventeen are in the process of being drilled, thirty-nine have been drilled and are now producing, and two have been "shut in."  DEX A, ¶ 67; DEX B at 1–3.

BLM is in the process of preparing programmatic NEPA analysis regarding cumulative impacts to water and air resources to supplement the thirty-two EAs challenged by Plaintiffs. BLM anticipates supplementing the thirty-two challenged EAs by the end of calendar year 2019. DEX A, ¶¶ 63, 69.

## STANDARDS OF REVIEW

### I.   PRELIMINARY INJUNCTIONS ARE EXTRAORDINARY REMEDIES.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995)).  "Because a preliminary injunction is an extraordinary remedy, 'the right to relief must be clear and unequivocal.'" *Chem. Weapons Working Grp., Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1489 (10th Cir. 1997) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir. 1991)).  The movant's "requirement for substantial proof is much higher" for a motion for a preliminary injunction than it is for a motion for summary judgment.  *Mazurek*, 520 U.S. at 972.

---

project proponent could submit up to nine additional APDs for the project, which have been analyzed by the same EA.  Each of those additional nine APDs would need to be approved by BLM before the project proponent could begin work on those wells.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). If a plaintiff fails to meet its burden on any of these four requirements, its request must be denied. *See, e.g.*, *id.* at 23–24 (denying injunctive relief on the public interest and balance of harms requirements alone, even assuming irreparable injury to endangered species and a violation of NEPA); *Chem. Weapons Working Grp.*, 111 F.3d at 1489 (holding that the plaintiffs' failure on the balance of harms "obviat[ed]" the need to address the other requirements); *Sprint Spectrum, L.P. v. State Corp. Comm'n of Kan.*, 149 F.3d 1058, 1060 (10th Cir. 1998). There is no presumption that an injunction automatically follows the violation of an environmental statute. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." *Diné CARES 2016*, 839 F.3d at 1282.

## II.     REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT ("APA")

NEPA does not provide a private right of action, so plaintiffs seeking to challenge an agency action on NEPA grounds must invoke the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. The APA provides a right of action and waives sovereign immunity for any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." *Id.* § 702. Moreover, because judicial review in this case "is sought . . . under the general review provisions of the APA, the

'agency action' in question must be 'final agency action.'" *Lujan v. Nat'l Wildlife Fed'n*, 497

U.S. 871, 882 (1990).[7]

A reviewing court must affirm an agency decision unless it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  The

scope of judicial review under this standard is narrow and deferential:

> A reviewing court must "consider whether the decision was based on a
> consideration of the relevant factors and whether there has been a clear error of
> judgment. . . . Although this inquiry into the facts is to be searching and careful,
> the ultimate standard of review is a narrow one. The court is not empowered to
> substitute its judgment for that of the agency." The agency must articulate a
> "rational connection between the facts found and the choice made." . . . [W]e will
> uphold a decision of less than ideal clarity if the agency's path may reasonably be
> discerned.

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 285–86 (1974) (citations

omitted); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not

set aside agency action . . . unless there is no rational basis for the action." (citing *Warm Springs

Dam Task Force v. Gribble*, 621 F.2d 1017, 1027 (9th Cir. 1980) (per curiam)).

A deferential approach is particularly appropriate where, as here, the challenged decision

implicates substantial agency expertise.  "When specialists express conflicting views, an agency

must have discretion to rely on the reasonable opinion of its own qualified experts even if, as an

original matter, a court might find contrary views more persuasive."  *Marsh v. Or. Natural Res.*

---

[7] While Plaintiffs purport to challenge "at least 255" APDs, Pet. ¶ 1, to date, BLM has only
approved 101 of the challenged APDs, and thus only those 101 APDs are properly before the
Court.  *See* DEX B at 65–66.  Insofar as Plaintiffs purport to challenge any APDs beyond those
101, that portion of Plaintiffs' claims must be dismissed for lack of finality. Until BLM approves
an APD and issues a record of decision, there has been no final agency action and there is
nothing for this Court to review.  *See* 5 U.S.C. § 704 (providing review only over final agency
actions); *Lujan*, 497 U.S. at 882; *Diné CARE 2018*, 312 F. Supp. 3d at 1087 ("The Court
concludes that challenging an unapproved APD, a withdrawn APD, or an APD in which the
operator has not submitted an APD package to BLM is not challenging final agency action. . .
.").

*Council*, 490 U.S. 360, 378 (1989).  "Because analysis of the relevant documents 'requires a high

level of technical expertise,' we must defer to 'the informed discretion of the responsible federal

agencies.'"  *Id.* at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).

## ARGUMENT

### I.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A.  The Air Analysis in the Challenged EAs Complies with NEPA.

Plaintiffs argue that the APDs challenged here suffer from the same defects as those

challenged in *Diné CARE I*.  However, the Tenth Circuit in *Diné CARE I* did not hold that there

were defects in BLM's analysis of air quality.  It instead noted that the record was insufficient

for it to determine whether BLM had adequately analyzed the air impacts in the challenged EAs.

*See Diné CARE I*, 923 F.3d at 855–56 ("BLM's NEPA analysis 'is entitled to the presumption of

regularity,' and Appellants have not carried their burden of demonstrating that BLM acted

arbitrarily or capriciously." (internal citation omitted)).  On that basis, it did not disturb the

district court's decision to reject plaintiffs' air quality claims.  *Id.*  Indeed, after reviewing

BLM's air analysis at an earlier stage of the case, the Tenth Circuit was "not persuaded that the

district court abused its discretion in concluding that Plaintiffs ha[d] not shown a substantial

likelihood of success on the merits of this argument."  *Diné CARE 2016*, 839 F.3d at 1283.

This Court should similarly find that Plaintiffs have no likelihood of success on the

merits of their air quality claim.  First, the 2003 RMP/EIS analyzed the cumulative air impacts of

9,942 wells.  *See* DEX D at 3.  Of those, only 4,000 wells have thus far been drilled.  DEX A, ¶

29.  Although Plaintiffs claim that new developments in horizontal drilling and fracking

11

technologies will cause the additional 3,960 foreseeable wells,[8] when combined with the 4,000

wells that have already been drilled, to exceed the total impacts analyzed in the 2003 RMP/EIS,

the Tenth Circuit held that Plaintiffs had failed to demonstrate that the combined impacts of

these wells would "exceed the total impacts predicted in the 2003 EIS." *Diné CARE I*, 923 F.3d

at 855. Thus, the 2003 RMP/EIS's analysis of cumulative air impacts remains valid.

Second, to the extent new developments in horizontal drilling and fracking technologies

are anticipated to alter the cumulative impacts as analyzed in the 2003 RMP/FEIS, BLM

adequately analyzed those impacts in the EAs. For example, in its discussion of air quality,

BLM took a hard look at new data, including data on greenhouse gases, horizontal drilling, and

fracking. *See, e.g.*, Pls.' Ex. 26 at 9–13, 29–36; DEX E at 33–35, 37–38, 47–51.[9] Given that the

101 APDs at issue in this case are far outnumbered by the 27,000 oil and gas wells currently

active in the San Juan Basin, and that electricity generation stations and vehicular traffic

significantly contribute to emissions in the area, BLM reasonably concluded that these wells

would not have a significant additional cumulative impact on air quality in the region. *See, e.g.*,

Pls.' Ex. 24 at 50 (very small increase in emissions that could result would not be expected to

result in exceeding the NAAQS for any criteria pollutants in the analysis area and very small

---

[8] In a 2014 Reasonably Foreseeably Development Scenario, BLM predicted the development of 3,960 horizontally-drilled Mancos Shale wells. *See Diné CARE I*, 923 F.3d at 837. In *Diné CARE I*, the Tenth Circuit held that those 3,960 wells were "reasonably foreseeable future actions" that BLM must consider under NEPA. *Id.* at 853.

[9] The EAs incorporate the Air Resources Technical Report by reference. *See e.g.*, Pls.' Ex. 25 at 11 (incorporating prior version of the report); 40 C.F.R. § 1502.21 ("Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action."). The Report has been updated several times, and the most recent version is from 2018.

increase in GHG emissions would not produce climate change impacts that differ from the No
Action Alternative).

By tiering to the PRMP/FEIS and RMP where possible, and analyzing additional impacts
relevant to horizontal drilling and fracking in the APD EAs, BLM met its obligation under
NEPA to both take a hard look at the reasonably foreseeable environmental impacts of each
proposed well and to "eliminate repetitive discussions of the same issues" at each stage of NEPA
review. 40 C.F.R. § 1502.20.

### B. The Challenged EAs Adequately Address Other Aspects of Hydraulic Fracturing.

Likewise, when analyzing other aspects of Plaintiffs' broader claims regarding the
generic harms of hydraulic fracturing on the environment, such as surface disturbance, the
district court in the previous litigation rejected Plaintiffs' arguments, and its finding was not
disturbed on appeal, except with respect to cumulative water use. *See Diné CARE 2018*, 312 F.
Supp. 3d at 1094–95. For the same reasons, Plaintiffs' similar claims in this suit are unlikely to
succeed on the merits of any aspect of their claims other than cumulative impacts of water use on
total water quantities.

For example, BLM took a hard look at potential water quality impacts caused by
horizontal drilling and fracking in the Mancos Shale. BLM concluded that fracking will not
contaminate surface water or groundwater aquifers because "the [p]roposed [project] is well
below any underground sources of drinking water." *See, e.g.*, Pls.' Ex. 27 at 16. BLM also
analyzed the "potential for accidental spills or releases of materials that could impact local water
quality. *See, e.g.*, *id.* at 16–17 (concluding that the closed loop storage system and containment
structures would prevent discharges to waters of the U.S.). With regard to surface disturbance,
the EAs adequately disclose the extent of the anticipated disturbance both during operations and

13

after reclamation.  *See, e.g.*, Pls.' Ex. 24 at 50–66; Pls.' Ex. 27 at 19–24.  Finally, to the extent

Plaintiffs are complaining of harms more generally associated with oil and gas activities, those

generic harms not associated with new technologies remain unchanged since BLM's RMP/EIS,

to which each of the challenged EAs tiers.  *See, e.g*., Pls.' Ex. 27 at 2.

### C.  The Scope of Relief Plaintiffs Seek is Not Supported by the Actions Challenged.

While Plaintiffs challenge only 101 APDs and thirty-two associated EAs, they seek to

"[e]njoin BLM from approving any pending or future APDs that permit horizontal drilling or

hydraulic fracturing in the Mancos Shale formation pending full compliance with NEPA."  Pet.

28 ¶ C.  The Court cannot grant Plaintiffs' requested remedy because it seeks to enjoin

hypothetical agency approvals that are not before the Court.  The Mancos Shale is part of an

incredibly active Basin, where over 37,000 oil and gas wells have been drilled, and currently

over 27,000 well are active, including thousands of wells on public lands.  *See* DEX A, ¶ 22.

Just since the implementation of the 2003 RMP, 4,000 wells have been drilled in the FFO

planning area.  *Id.* ¶ 29.  Plaintiffs have not challenged the agency actions supporting the vast

majority of these wells or future wells, let alone provided the Court with a record on which it

could determine whether BLM has complied with NEPA.  *See Diné CARE I*, 923 F.3d at 844,

859 (limiting its review to only six and remedy to only five EAs because "[a]lthough Appellants

challenge more than 300 individual agency actions, they have provided us with the complete

record of BLM's decisionmaking process for only a few of the challenged actions. We are

therefore unable to evaluate the sufficiency of BLM's NHPA and NEPA analyses for the vast

majority of the challenged actions.").

Furthermore, this Court lacks jurisdiction to enjoin BLM from approving APDs in the

future because those claims are not yet ripe.  The APA provides for judicial review of "final

14

agency action[s]."  5 U.S.C. § 704; *Lujan*, 497 U.S. at 882; *supra* n.7.  Until BLM approves an

APD and issues a record of decision, there has been no final agency action and there is nothing

for this Court to review.  Plaintiffs' presumption that BLM will fail to comply with NEPA in its

future APD approvals is pure speculation and cannot be the basis for a claim.  *Lujan*, 497 U.S. at

894 ("[W]e intervene in the administration of the laws only when, and to the extent that, a

specific 'final agency action' has an actual or immediately threatened effect."); *Diné CARE*

*2018*, 312 F. Supp. 3d at 1087.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE INJURY.

To constitute irreparable injury, "an injury must be certain, great, actual and not

theoretical."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)  (citation and

internal quotation marks omitted).  Plaintiffs cannot meet their burden here because their injury

is overstated.

Of the 101 approved APDs at issue here, thirty-nine have been drilled and are now

producing, and two have been "shut in."  DEX A, ¶ 67.  For these forty-two wells, industry

operators have already completed the drilling process, and thus finished with the part of the

well's life cycle that has the greatest health and environmental impacts, as Plaintiffs themselves

recognize.  *See* Pls.' Mem. in Supp. of Mot. for TRO & Preliminary Inj. 15–17, ECF No. 5-1

("Pls.' Mot.") (identifying "well construction, hydraulic fracture stimulation, well pad, road, and

pipeline construction, as well as new facility installation and expansion of existing facilities" as

activities giving rise to irreparable harm); *see also Diné Citizens Against Ruining Our Env't v.*

*Jewell*, No. CIV 15-0209 JB/SCY, 2015 WL 4997207, at *46 (D.N.M. Aug. 14, 2015) *(Dine*

*Care 2015)*, *aff'd*, 839 F.3d 1276 (10th Cir. 2016) ("Plaintiffs are not seeking to shut down

completed and operating wells, even if they believe the well's APD was erroneously approved:

because once a well has been fracked, the environmental damage is done.").  The district court

thus recognized that an injunction would be especially unmerited as to wells that are already in production. *Id*. at *20 n.9 ("[W]ells are usually fracked before production begins; they are not fracked continuously throughout production. The environmental harms associated with fracking are completed and cannot be undone once well is fracked. The Plaintiffs would thus prevent no fracking-related environmental harms by shutting down completed wells.").[10] As a result, Plaintiffs have not shown that the wells that are already in production are now causing them an irreparable injury.

Plaintiffs' assertions of irreparable injury as to producing wells are also undermined by their delay in seeking relief. Plaintiffs first filed their suit in *Diné CARE I* in March 2015, *see Diné Citizens v. Jewell*, No. 1:15-cv-00209, ECF No. 1 (D.N.M. March 11, 2015), and were actively litigating similar claims against other EAs within the Mancos Shale until the Tenth Circuit's decision in May 2019. *See Diné CARE I*, 923 F.3d at 835–36. Over the course of the litigation, they amended their petition three times to include additional APDs in the suit. *See id*. at 838. Yet Plaintiffs did not move to include any of the thirty-two EAs or the approved APDs at issue in this suit to *Diné CARE I*, despite the fact that many of the EAs and APDs challenged here were issued prior to the district court's final order in *Diné Care I*. *See Diné Citizens v. Jewell*, No. 1:15-cv-00209, ECF No. 146 (D.N.M. June 5, 2018); DEX B at 4–63 (listing sundry

---

[10] The Matthews Declaration and other evidence in the record describes the part of a well's lifecycle after it has entered into production, showing that associated impacts are modest by comparison. *See* DEX F at 44–45; DEX A, ¶ 48 (explaining that, six months after drilling is completed, surface disturbance must be further minimized by reclamation of all portions of the well site not needed for production operations, and that, after drilling, all areas of the well pad that are not needed for day to day operations are re-contoured back to the natural topography and reseeded); DEX A ¶¶ 53–54 (Air impacts during production minimal compared to impacts of construction and drilling); *see also* DEX E at 34–35; DEX A, ¶¶ 53; DEX F at 44–46 (showing that, while there are some construction impacts during reclamation, they are far less than during construction and drilling).

notice dates for activities under approved APDs).  Nor did they file for emergency relief from

any of the APDs approved under these thirty-two EAs, despite the fact that five of the EAs date

back to 2016, twelve EAs were issued in 2017, twelve more in 2018, and the remaining two EAs

were released in April 2019.  *See* Pls.' Ex. 6–36; DEX. B (noting activities under approved

APDs from 2015–2019).  At bottom, Plaintiffs waited to bring this action until after forty-two

wells had completed the most impactful parts of their lifecycle.  They cannot credibly assert that

an injunction as to those wells at this time is necessary to preserve their rights.  "Delay of this

nature undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief

and suggests that there is, in fact, no irreparable injury."  *GTE Corp. v. Williams*, 731 F.2d 676,

678 (10th Cir. 1984) (citation and quotations omitted).

Even for those wells that have not yet been drilled or hydraulically fractured, Plaintiffs'

characterization of the injury is overstated because the Basin already has over 27,000 active

wells in an area spanning 16,000 square miles.  DEX A, ¶¶ 21–22.  Plaintiffs' Petition, by

contrast, challenges only 101 approved APDs, forty-two of which have yet to be drilled, and

seventeen of which are in the process of being drilled.  *See* DEX B at 1–3; DEX A, ¶ 67.  Given

the long history of oil and gas development in this region, these few additional wells do not

create the kind of irreparable injury that justifies emergency relief.[11]  Plaintiffs' characterization

---

[11] While several of the Plaintiffs' declarations cite concerns about the Chaco Canyon Historic Park, none of the APDs at issue would authorize drilling in the park.  *See* Map of Locations of Approved APDs, attached as DEX C.  In addition, BLM has been deferring new leases within a ten-mile radius of Chaco Canyon Historic Park until the Record of Decision for the forthcoming RMPA/EIS is signed.  *See* DEX A, ¶ 56.

In addition, the Chacoan Outliers Protection Act ("COPA"), 16 U.S.C. §§ 410ii et seq., which established the Chaco Culture National Historical Park, expressly recognized the importance of oil and gas development in the Basin, *id.* § 410ii(a).  COPA does not "prevent exploration and development of subsurface oil and gas . . . from without the sites which does not infringe upon the upper surface of the sites."  *Id.* § 410ii-5(c); *see also id.* § 410ii(a)(3) ("[D]evelopment of the

of its injury is also inconsistent with the scope of this litigation because Plaintiffs attempt to justify their request for an injunction in large part by pointing to harms from APD approvals beyond those challenged here.  *See* Pls.' Mot. 17–18; *supra* n.7.  These cannot serve as a basis for emergency injunctive relief.  In weighing the Plaintiffs' alleged injuries, this Court must focus instead on the potential impacts resulting from development associated with the 101 APD approvals challenged in this case.

### III.     THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION.

The balance of harms does not tip in Plaintiffs' favor, both because their actual injuries are overstated—as explained above—and because BLM has made reasonable, good faith efforts to ensure compliance with NEPA.  *See* Pls.' Mot. 24–25 (arguing that the public interest is served when agencies comply with the law).  In *Diné CARE 2015*, the district court found that the balance of harms weighed against granting the injunction because there were significant economic costs to the operators.  *Diné CARE 2015*, 2015 WL 4997207, at *50.  The court found that the plaintiffs had failed to "establish[] what the magnitude or the likelihood of harm resulting from an environmental catastrophe would be," or  "that the more mundane, certain, day-to-day harms inflicted by drilling outweigh the economic benefits of the drilling."  *Id.*

Here, Plaintiffs have similarly failed to carry their burden.  The declarations provided by Plaintiffs note alleged health and environmental harms generally associated with new oil and gas development in the region, and largely tied to either air quality impacts or surface disturbance impacts.  *See, e.g.*, Pls.' Ex. 40 ¶¶ 9–17; Pls.' Ex. 42 ¶¶ 7–14 Pls.' Ex. 44 ¶¶ 8–14; Pls.' Ex. 45 ¶¶ 15–17.  But these aspects of BLM's EAs for the area have thus far been upheld.  *See Diné*

San Juan Basin's important natural resources and the valid existing rights of private property owners will not be adversely affected by the preservation of the archeological integrity of the area.").

*CARE 2018*, 312 F. Supp. 3d 1031; *Diné CARE 2016*, 839 F.3d at 1283–85; *Diné CARE I*, 923 F.3d at 855.  Significantly, the declarations do not allege harms related to water usage, which was the one part of BLM's analysis the Tenth Circuit found to be flawed, and they do not quantify the magnitude of their harms from the specific additional wells authorized by the challenged EAs.

Plaintiffs' refrain that the public interest is served by "having government officials act in accordance with law," *see* Pls.' Mot. at 24, similarly misses the mark.  Plaintiffs here criticize only discrete aspects of BLM's NEPA analysis.  Meanwhile, the record demonstrates that BLM has invested significantly in its NEPA compliance.  Of note, BLM prepared a comprehensive RMP/EIS in 2003; it prepared APD-specific EAs to further supplement the 2003 analysis upon each new authorization; and it undertook a new long-term RMP amendment process to ensure that full-field development of the Mancos Shale—should that ever occur—will be fully analyzed in a programmatic NEPA document to the extent it causes environmental impacts beyond the scope of the 2003 RMP/EIS.  *See* DEX A ¶¶ 21–34.  Further, in response to the Tenth Circuit's narrow decision that five EAs did not adequately analyze water quantity, BLM immediately undertook the analysis the court found wanting, solicited public comment, and issued updated EAs.  DEX A, ¶¶ 58–61.  In sum, BLM has undertaken a good faith and thorough consideration of the potential environmental impacts of managing public lands for the development of oil and gas, and it has taken the steps necessary to ensure that it continues to comply with NEPA in the future.

Similarly with respect to the thirty-two EAs at issue here, BLM has already decided to revisit those analyses in accordance with its understanding of the Tenth Circuit's holding in *Diné CARE I*.  BLM estimates that it will complete its analysis by the end of 2019.  DEX A, ¶¶ 63, 69.

Thus, even if the court were to find that Plaintiffs are likely to succeed on the merits, there can be no question that BLM has made every reasonable effort to come into compliance. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 206 (4th Cir. 2005) (recognizing that the defendant agency's EIS, while deficient, was "not contemptuous of NEPA's important mandate").  The public interest, therefore, does not tip in Plaintiffs' favor.

By contrast, the record amply demonstrates that an injunction in this case would cause disproportionate harm to the local economy, Federal energy policy, and the broader public interest.[12]  The local economy relies heavily—both directly and indirectly—on the oil and gas activities in the San Juan Basin.  In fact, oil and gas-related companies make up four of the top ten taxpayers in San Juan County.  DEX A, ¶ 73.  In 2014, oil and gas production and equipment were valued at approximately 22% of the total net taxable value of business activities in the County.  *Id.*  Oil and gas production contributed over $24 million in ad valorem taxes and $23 million in county tax payments to San Juan County in fiscal year 2012.  *Id.*  In Fiscal Year 2018, the New Mexico State Land Office reported $2.2 billion in revenue from oil and gas royalties alone for the state's public schools, universities, and hospitals.  *Id.* ¶ 78.  In addition, oil and gas

---

[12] While Plaintiffs argue that more than financial harm is needed to outweigh their environmental harm, the "Supreme Court has recognized that financial harm can be weighed against environmental harm—and in certain instances outweigh it." *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 892 (10th Cir. 2013) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).  In similar cases—including *Dine CARE I*—the Tenth Circuit upheld district court denials of preliminary injunctions when the district court found that the public interest in oil and gas production either equaled or outweighed Plaintiffs' alleged harms. *See Sierra Club*, 539 F. App'x at 892 ; *Diné CARE 2016*, 839 F.3d 1276; *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1231 (10th Cir. 2008).

is directly responsible for $493 million of New Mexico's Severance Tax Permanent Fund and $679 million of the Land Grand Permanent Fund. *Id.*[13]

Any injunction would also be acutely felt by the Indian allottees whose mineral interests would be impacted. DEX A, ¶ 74. Many allottees rely on the monthly royalty checks to subsist and going without this income during the period of the injunction would impose hardships on those families. *Id.* An injunction could also prevent Indian allottees from receiving royalty payments on valid existing leases that have not yet been developed. *Id.* Furthermore, an injunction has the potential to cause irreparable economic harm to the affected operators. Shutting in wells that are already producing can decrease the future production abilities of wells in certain types of formations or reservoirs. *Id.* ¶¶ 71–72, and such impacts increase the longer a well is shut in. *Id.* ¶ 71. The costs associated with shutting in a well and then returning it to production can be expensive, and may even mean that a well is never returned to production. *Id.* ¶ 73. If this were to occur, it could potentially impact both the operators and Indian allottees long after the injunction was lifted.

An injunction of the type requested by Plaintiffs could also impact U.S. energy policy. "[T]he [San Juan] Basin is currently one of the most prolific sources of natural gas in the country." *Diné CARE I,* 839 F.3d at 1279. In 2017, wells in the San Juan Basin produced over 464 million cubic feet of gas and 5.9 million barrels of oil. DEX A ¶ 22. The area has cumulatively produced more than 202,312,970 barrels of oil and 31,763,213,158 cubic feet of

---

[13] The Severance Tax Permanent Fund serves as an investment fund for severance taxes, allowing that money to be used for future capital projects. The Land Grant Permanent Fund provides more than a half-billion dollars in benefits to New Mexico's public schools, universities, and other beneficiaries every year. DEX A ¶ 78.

gas.[14]  Between 2003 and 2013, oil and gas development in the FFO region generated $5.2

billion dollars in federal royalties, of which 49% was disbursed to the State of New Mexico for

funding education efforts throughout the state.  DEX A ¶¶ 22, 80.  These royalty amounts would

be impacted by an injunction, as would the amount of domestic oil and gas produced in America,

resulting in the need for increased foreign oil and gas imports.  *Id.* ¶ 80.  As other courts have

observed, "[t]he development of domestic energy resources is of paramount interest and [that

interest] will be harmed (at least to some extent) if that development is delayed."  *Nat. Res. Def.*

*Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007).

Moreover, no bond or other measure could fully compensate the public for the

impairment that would be caused by a disruption of the projects at issue here.  Under such

circumstances, the public interest would best be served by an order denying any injunctive relief

until it is able to make a final determination on the merits.  *See Yakus v. United States*, 321 U.S.

414, 440 (1944).  This holds true even in cases where "the postponement [of injunctive relief]

may be burdensome to the plaintiff."  *Id*.  And, as noted above, any burden on the Plaintiffs in

this case would be minimal, as evidenced by Plaintiffs' delay before filing this lawsuit.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

14th day of August, 2019.

LAWRENCE VANDYKE

---

[14] This long history of oil and gas development also demonstrates why this case stands in contrast
to the one cited by Plaintiffs in support of their position, *San Luis Valley Ecosystem Council v.*
*U.S. Fish & Wildlife Serv*., 657 F. Supp. 2d 1233, 1236 (D. Colo. 2009).  *San Luis* dealt with oil
and gas drilling in the Baca National Wildlife Refuge—an area specially designated by Congress
for having "unique hydrological, biological, educational and recreational values," *id*., and the
court emphasized these unique environmental aspects and the plaintiffs' evidence regarding their
importance in reaching its irreparable harm and balance of harm determinations, *id*. at 1241–43,
and noted that the federal agency could not identify any specific injury that it would suffer as a
result of a preliminary injunction.  *Id.* at 1242.

Deputy Assistant Attorney General

_/s/ *Corinne Snow 8/14/19*_____ ___
CORINNE SNOW
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave, NW
Washington, D.C. 20530
Tel: (202) 514-3370
corinne.snow@usdoj.gov

ANDREW A. SMITH
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
c/o United States Attorney's Office
P.O. Box 607
Albuquerque, New Mexico 87103
505-224-1468
andrew.smith@usdoj.gov

JOHN C. ANDERSON
United States Attorney

*/s/ Christopher F. Jeu  8/14/19*_____
CHRISTOPHER F. JEU
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 224-1458; Fax: (505) 346-7205
Christopher.Jeu@usdoj.gov

*Counsel for Federal Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 14, 2019, I filed the foregoing pleading electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

_/s/ *Corinne Snow*_____ ___
Corinne Snow
Attorney for Defendants

23